**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

KATHLEEN M. WINN, an Arizona
taxpayer; DIANE WOLFTHAL, an
Arizona taxpayer; MAURICE
WOLFTHAL, an Arizona taxpayer
LYNN HOFFMAN, an Arizona
taxpayer,
      *Plaintiffs-Appellants,*

      v.

ARIZONA CHRISTIAN SCHOOL TUITION
ORGANIZATION; ARIZONA SCHOOL
CHOICE TRUST; LUIS MOSCOSO;
GALE GARRIOTT, in his official
capacity as Director of the
Arizona Department of Revenue;
GLENN DENNARD,
      *Defendants-Appellees.*

No. 05-15754

D.C. No.
CV-00-00287-EHC

OPINION

Appeal from the United States District Court
for the District of Arizona
Earl H. Carroll, District Judge, Presiding

Argued and Submitted
January 24, 2008—Pasadena, California

Filed April 21, 2009

Before: Dorothy W. Nelson, Stephen Reinhardt and
Raymond C. Fisher, Circuit Judges.

Opinion by Judge Fisher

4587

## COUNSEL

Marvin S. Cohen (argued), Sacks Tierney, P.A., Scottsdale, Arizona; Paul Bender, Arizona State University College of Law, Tempe, Arizona; and Isabel M. Humphrey, Three Gateway, Phoenix, Arizona, for the plaintiffs-appellants.

Terry Goddard, Arizona Attorney General, and Paula S. Bickett (argued), Phoenix, Arizona, for the defendants-appellees.

Timothy D. Keller (argued) and Clint Bolick, Institute for Justice, Phoenix, Arizona; and Richard D. Komer, Institute for Justice, Washington, D.C., for intervenors-defendants-appellees Arizona School Choice Trust, Glenn Dennard and Luis Moscoso.

Benjamin W. Bull, Gary S. McCaleb, Jeremy D. Tedesco, Alliance Defense Fund, Scottsdale, Arizona, for intervenor-defendant-appellee Arizona Christian School Tuition Organization.

**OPINION**

FISHER, Circuit Judge:

Arizona law grants income tax credits restricted to taxpayers who make contributions to nonprofit organizations that award private school scholarships to children. Plaintiffs, certain Arizona taxpayers, allege that some of the organizations funded under this program restrict the availability of their scholarships to religious schools, and that the program in effect deprives parents, the program's aid recipients, of a genuine choice between selecting scholarships to private secular schools or religious ones. We conclude that the plaintiffs' complaint, which at this stage of the litigation we must view in the light most favorable to the plaintiffs, sufficiently alleges that Arizona's tax-credit funded scholarship program lacks religious neutrality and true private choice in making scholarships available to parents. Although scholarship aid is allocated partially through the individual choices of Arizona taxpayers, overall the program in practice "carries with it the *imprimatur* of government endorsement." *Zelman v. Simmons-Harris*, 536 U.S. 639, 655 (2002). We therefore hold, contrary to the district court, that plaintiffs' allegations, if accepted as true, are sufficient to state a claim that Arizona's private school scholarship tax credit program, as applied, violates the Establishment Clause of the United States Constitution.

**BACKGROUND**

Plaintiffs allege that Arizona's Revised Statute § 43-1089 ("Section 1089"), as applied, violates the Establishment Clause of the First Amendment. Section 1089, first enacted by the Arizona legislature in 1997, gives individual taxpayers a dollar-for-dollar tax credit for contributions to "school tuition organizations" ("STOs").[1] A STO is a private nonprofit orga-

---

[1]A parallel statute, which plaintiffs do not challenge in this action, gives corporations a dollar-for-dollar tax credit for contributions to STOs. *See* Ariz. Rev. Stat. § 43-1183.

nization that allocates at least 90 percent of its funds to tuition grants or scholarships for students enrolled in "a nongovernmental primary or secondary school or a preschool for handicapped students" within the state. Ariz. Rev. Stat. Ann. § 43-1089(G)(2)-(3) (2005).[2] STOs may not provide scholarships to schools that "discriminate on the basis of race, color, handicap, familial status or national origin," but nothing in the statute precludes STOs from funding scholarships to schools that provide religious instruction or that give admissions preferences on the basis of religious affiliation. *Id*. § 1089(G)(2). Individual taxpayers can claim a tax credit of up to $500 for such contributions and married couples filing jointly can claim a credit of up to $1,000, provided the allowable tax credit does not exceed the taxes otherwise due. *Id*. § 1089(A)-(B). Taxpayers may designate their contribution to a STO that agrees to provide a scholarship to benefit a particular child, so long as the child is not the taxpayer's own dependent. *Id*. § 1089(E). The tax credit is available to all taxpayers in Arizona, regardless of whether they are parents of school-age children or pay any private school tuition themselves.

Section 1089 requires STOs to provide scholarships or tuition grants to children "to allow them to attend *any* qualified school of their parents' choice," but also states that STOs may not provide scholarships while "limiting availability to only students of one school." *Id*. § 1089(G)(3) (emphasis added). On its face, then, Section 1089 could have been interpreted to require all STOs to provide scholarships to any qualified private school in the state, or to permit STOs to provide scholarships to a limited set of schools, so long as that set was greater than one. In practice, plaintiffs allege, many STOs have opted to limit the schools to which they offer scholar-

---

[2]Hereinafter, all cites to "Section 1089" refer to Arizona Revised Statute Annotated § 43-1089 (2005). Any differences between this current version of Section 1089 and the version in place as of February 2000, when plaintiffs' complaint was filed, are not significant for the purposes of our analysis.

ships, and a number of STOs provide scholarships that may be used only at religious schools or schools of a particular denomination. For example, plaintiffs allege that Arizona's three largest STOs, as measured by the amount of contributions reported in 1998, each restricts its scholarships to use at religious schools. The largest of these, the Catholic Tuition Organization of the Diocese of Phoenix, restricts its scholarships to use at Catholic schools in the Phoenix Diocese such as St. Mary's, which advertises its mission as being "to provide a quality Catholic education by developing and sustaining a rich tradition grounded in Gospel and family values." The second largest STO, the Arizona Christian School Tuition Organization, expressly restricts scholarships to use at "evangelical" Christian Schools. The third largest, Brophy Community Foundation, restricts its scholarships to use at two Catholic schools, one of which advertises its goal to be "instill[ing] a knowledge of the truths of faith, enlightened by the post-Conciliar teachings of the Church," and the other of which promotes itself as offering students "an intimate relationship with God" through "the process of nurturing the soul."

Arizona does not specify scholarship eligibility criteria or dictate how STOs choose the students who receive scholarships, and STO-provided scholarships therefore vary considerably. Although STOs may choose to award scholarships primarily based on financial need, Section 1089 does not require it. The availability of scholarships to particular students and particular schools thus depends on the amount of funding a STO receives, the range of schools to which it offers scholarships and the STO's own scholarship allocation decisions and eligibility criteria. Therefore, plaintiffs allege, because the largest STOs restrict their scholarships to sectarian schools, students who wish to attend non-religious private schools are disadvantaged in terms of the STO-provided scholarships available to them. Thus, plaintiffs argue, the disparities in the availability and amount of scholarships for use at religious and secular schools show that the structure of Sec-

tion 1089, as applied, favors religious over secular schools, and thereby violates the Establishment Clause.

Before Section 1089 became operative, the Arizona Supreme Court, based on its construction of the statute, held that it did not on its face violate the Establishment Clause or provisions of the Arizona state constitution. *See Kotterman v. Killian*, 972 P.2d 606 (Ariz. 1999) (en banc).[3] After the statute took effect, different plaintiffs filed this suit against the Director of Arizona's Department of Revenue in the United States District Court for the District of Arizona.[4] Plaintiffs do not contest the facial validity of Section 1089, but rather assert that it violates the Establishment Clause as applied.[5] The district court dismissed the suit as barred by the Tax Injunction Act. *See Winn v. Killian*, 307 F.3d 1011, 1013 (9th Cir. 2002). We reversed the dismissal, *see id.* at 1020, and the Supreme Court affirmed our decision. *See Hibbs v. Winn*, 542 U.S. 88, 112 (2004). On remand, the district court allowed two STOs, the Arizona Christian School Tuition Organization ("ACSTO") and Arizona School Choice Trust ("ASCT"), and two parents of ASCT scholarship recipients, Glenn Dennard and Luis Moscoso, to intervene as defendants. ACSTO provides scholarships only to religious schools and the ASCT

---

[3]Significantly, in rejecting the facial challenge, the Arizona Supreme Court interpreted Section 1089 to require that "[e]very STO must allow its scholarship recipients to 'attend *any* qualified school of their parents' choice,' and may not limit grants to students of only one such institution." *Id.* at 614 (quoting Ariz. Rev. Stat. Ann. § 43-1089(E)(2) (2005) (emphasis added)). "Thus," the Arizona Supreme Court concluded, "schools are no more than indirect recipients of taxpayer contributions, with the final destination of these funds being determined by individual parents." *Id.* Because plaintiffs in this action allege that, in practice, Section 1089 permits STOs to restrict the use of their scholarships to *certain* schools, the structure of the program as applied is notably different from the program's structure as it was considered in *Kotterman*.

[4]Current Director Gale Garriott has since replaced former Director Mark Killian as the named defendant.

[5]Plaintiffs' complaint alleged that Section 1089 is invalid both on its face and as applied, but they have since abandoned their facial challenge.

provides scholarships to any private school of the parents' choice.[6] Defendants again moved to dismiss, contending that plaintiffs lacked standing, that the suit was barred by res judicata and that plaintiffs had failed to state a claim under the Establishment Clause. The district court granted defendants' motion to dismiss for failure to state a claim and plaintiffs appealed. We have jurisdiction under 28 U.S.C. § 1291 and we reverse and remand for further proceedings.

## STANDARD OF REVIEW

We review the district court's dismissal for failure to state a claim de novo, "accept[ing] all factual allegations in the complaint as true and constru[ing] the pleadings in the light most favorable to the nonmoving party." *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005). We affirm the district court "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Enesco Corp. v. Price/Costco, Inc.*, 146 F.3d 1083, 1085 (9th Cir. 1998) (internal quotation marks omitted). "Standing is a question of law that we review de novo." *Salmon Spawning & Recovery Alliance v. Gutierrez*, 545 F.3d 1220, 1224 (9th Cir. 2008).

## ANALYSIS

### I.    Taxpayer Standing

[1] Plaintiffs' only allegation of injury from the allegedly unconstitutional operation of Section 1089 arises from their status as Arizona taxpayers. It is well established that individ-

---

[6]We use the term "defendants" to refer to the Director of Arizona's Department of Revenue and the intervening defendants ACSTO, ASCT, Dennard and Moscoso. We use the term "defendant-intervenors" when referring only to the intervening defendants. At oral argument, plaintiffs stipulated that they challenge only those STOs that restrict scholarships to religious schools, and thus we note that ASCT is not being directly challenged.

uals do not generally have standing to challenge governmental spending solely because they are taxpayers, because "it is a complete fiction to argue that an unconstitutional federal expenditure causes an individual federal taxpayer any measurable economic harm." *Hein v. Freedom From Religion Found., Inc.*, 127 S. Ct. 2553, 2559 (2007) (plurality opinion). This rule applies with equal force to taxpayer suits challenging an allegedly unconstitutional state action and those challenging federal action. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342-49 (2006); *Arakaki v. Lingle*, 477 F.3d 1048, 1062-63 (9th Cir. 2007). The Supreme Court, however, has long recognized "a narrow exception to the general constitutional prohibition against taxpayer standing" when a plaintiff contends that a use of funds violates the Establishment Clause. *Hein*, 127 S. Ct. at 2564; *see Flast v. Cohen*, 392 U.S. 83, 88 (1968). Because plaintiffs have alleged that the state has used its taxing and spending power to advance religion in violation of the Establishment Clause, we hold that they have standing under Article III to challenge the application of Section 1089.

**[2]** As the Supreme Court recently reaffirmed, the *Flast* exception to the general bar against taxpayer standing is rooted "in the history of the Establishment Clause" and is designed to prevent " 'the specific evils feared by [its drafters] that the taxing and spending power would be used to favor one religion over another or to support religion in general.' " *DaimlerChrysler*, 547 U.S. at 348 (alterations in original) (quoting *Flast*, 392 U.S. at 103). The exception recognizes that the "injury" alleged in Establishment Clause challenges to governmental spending arises not from the effect of the challenged program on the plaintiffs' own tax burdens, but from "the very 'extract[ion] and spend[ing]' of 'tax money' in aid of religion." *Id.* (alterations in original) (quoting *Flast*, 392 U.S. at 106). Therefore, to satisfy the *Flast* test for taxpayer standing, plaintiffs need not show that an injunction against a particular taxing or spending program would cause "lawmakers . . . [to] dispose of the savings in a way that

would benefit the taxpayer-plaintiffs personally." *Id.* at 348-49. Instead, they need only show that the program challenged involves "a sufficient nexus between the taxpayer's standing as a taxpayer and the . . . [legislative] exercise of taxing and spending power." *Bowen v. Kendrick*, 487 U.S. 589, 620 (1988).

**[3]** Section 1089 gives Arizona taxpayers a tax credit for amounts they donate to STOs, up to the statutory cap of $500 for individuals or $1,000 for married couples filing jointly or the taxpayers' entire state tax liability. *See* Ariz. Rev. Stat. Ann. § 43-1089(A), (C). Tax credits are deducted *after* taxpayers' tax liability has been calculated, thereby giving taxpayers dollar-for-dollar "credits" against their state taxes for sums paid to STOs. Tax credits therefore operate differently from tax deductions; whereas tax deductions allow taxpayers only to reduce their income subject to taxation, tax credits allow individuals to make payments to a third party *in satisfaction of* their assessed tax burden. As the Supreme Court explained, "[i]n effect, § 43-1089 gives Arizona taxpayers an election" to direct a portion of the money they owe the state to either a STO or to the Arizona Department of Revenue. *Hibbs*, 542 U.S. at 95. Accordingly, "[a]s long as donors do not give STOs more than their total tax liability, their . . . contributions are costless." *Id.* Tax credits are therefore a powerful legislative device for directing money to private organizations.[7]

---

[7]Section 1089's success is evident from the year-over-year increases in contributions since the program took effect. Plaintiffs allege that taxpayers claimed $1.8 million in credits for contributions to STOs in 1998, when the program was under legal challenge that made it unclear whether donors would receive the credit, and over $5.9 million in 1999. According to data on the Arizona Department of Revenue's public website, these contributions appear to have further increased since the filing of plaintiffs' complaint, with taxpayers claiming credits worth over $54 million in 2007. *See* Arizona Department of Revenue Office of Economic Research & Analysis, Individual Income Tax Credit for Donations to Private School Tuition Organizations, 2007, at 3 (April 1, 2008), *available at http://www.revenue.state.az.us/ResearchStats/private_schl_credit_report_2007.pdf* (last visited April 13, 2009).

Defendant-intervenors argue that plaintiffs do not have standing to challenge Section 1089 even under the *Flast* exception, because the money directed by taxpayers to STOs under the tax credit program does not pass through the state treasury and therefore the program cannot be characterized as involving any "expenditure" of public funds.[8] The Supreme Court has recognized, however, that state tax policies such as tax deductions, tax exemptions and tax credits are means of "channeling . . . [state] assistance" to private organizations, which can have "an economic effect comparable to that of aid given directly" to the organization. *Mueller v. Allen*, 463 U.S. 388, 399 (1983). The Court has therefore refused to make artificial distinctions between direct grants to religious organizations and tax programs that confer special benefits on religious organizations, particularly tax credits such as the one challenged here. As the Court noted, "for purposes of determining whether such aid has the effect of advancing religion," it makes no difference whether the qualifying individual "receives an actual cash payment . . . [or] is allowed to reduce . . . the sum he would otherwise be obliged to pay over to the state." *Comm. for Pub. Educ. & Religious Liberty v. Nyquist*, 413 U.S. 756, 790-91 (1973). In either case, "the money involved represents a charge made upon the state for the purpose of religious education." *Id*. at 791 (internal quotation marks omitted); *see also Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 236 (1987) (Scalia, J., dissenting) ("Our opinions have long recognized — in First Amendment contexts as elsewhere — the reality that tax exemptions, cred-

---

[8]ACSTO's argument that our reasoning is bound by *Kotterman*'s conclusion that the tax credit does not constitute an "appropriation of public money" within the meaning of the Article II, Section 12 and Article IX, Section 10 of the Arizona constitution, *see* 972 P.2d at 617-21, is meritless. The Arizona Supreme Court's holding has no bearing on our analysis of plaintiffs' standing in federal court, which turns on the requirements derived from Article III of the U.S. Constitution. *Cf. Hein*, 127 S. Ct. at 2562 ("One of the controlling elements in the definition of a case or controversy under Article III is standing.") (internal quotation marks and alterations omitted).

its, and deductions are a form of subsidy that is administered through the tax system.") (internal quotation marks omitted). In effect, Section 1089 works the same as if the state had given each taxpayer a $500 check that can only be endorsed over to a STO or returned to the state. Because Section 1089 does not allow taxpayers to keep the money under any circumstance — and because it directs how the money will be spent if it is *not* surrendered to the state — we reject the suggestion that this money is not publicly subsidized simply because it does not pass through the treasury.

Nor does Section 1089 lack "a sufficient nexus between the taxpayer's standing as a taxpayer and the . . . [legislative] exercise of taxing and spending power" just because the Arizona legislature does not transfer money to STOs or religious schools directly. *See Bowen*, 487 U.S. at 620. The Arizona legislature promulgated Section 1089 under the power conferred by Article IX of the Arizona constitution, a provision that is equivalent to the U.S. Constitution's taxing and spending clause. *See* Ariz. Const. art. IX, § 3. By giving taxpayers a dollar-for-dollar credit for contributions to STOs and then requiring STOs to "allocate[ ] at least ninety percent of . . . [their] annual revenue for educational scholarships or tuition grants to children," the state legislature has provided only two ways for this money to be spent: taxpayers will either give the dollar to the state, or that dollar (or at least 90 percent of it, after allowable STO administrative expenses) *will* end up in scholarships for private school tuition. *See* Ariz. Rev. Stat. Ann. § 1089(G)(3) (2005).

**[4]** By structuring the program as a dollar-for-dollar tax credit, the Arizona legislature has effectively created a grant program whereby the state legislature's funding of STOs is mediated through Arizona taxpayers. The Court has recognized that taxpayer standing exists even when a legislature does not directly allocate funds to religious organizations, but instead mediates the funds through another agency. *See Bowen*, 487 U.S. at 618-20. Although the Arizona legislature

has chosen an alternative method of allocating the funds that Section 1089 makes available to STOs, the Court clarified in *Bowen* that it was the legislature's exercise of its taxing and spending power, rather than the actions of the agency, that permitted taxpayers to raise an Establishment Clause challenge. *See id.* at 619 ("We do not think . . . that appellees' claim that . . . [appropriated] funds are being improperly used by individual grantees is any less a challenge to congressional taxing and spending power simply because the funding authorized by Congress has flowed through and been administered by the Secretary [of Health and Human Services]."). Accordingly, under *Bowen*, taxpayers have standing to challenge a legislature's exercise of its taxing and spending power even when the legislature does not use that power to directly fund religious organizations, but instead uses the power to authorize third parties to fund such organizations.

[5] Consistent with these principles, the Supreme Court has repeatedly decided Establishment Clause challenges brought by state taxpayers against state tax credit, tax deduction and tax exemption policies, without ever suggesting that such taxpayers lacked Article III standing. *See, e.g.*, *Mueller*, 463 U.S. at 390 (state income tax deduction for school expenses that could be claimed for expenses at religious schools); *Nyquist*, 413 U.S. at 789-90 (hybrid state tax deduction-tax credit program for tuition paid to private schools); *Hunt v. McNair*, 413 U.S. 734, 737-38 (1973) (state tax exemption for state-issued revenue bonds that went in part to religious schools); *Walz v. Tax Comm'n*, 397 U.S. 664, 666 (1970) (state property tax exemption for religious nonprofit organizations). The Supreme Court has also repeatedly decided challenges brought by state taxpayers to indirect aid programs — where the ultimate decision to confer aid rested with a private individual and not the government — and again never suggested that taxpayers lacked standing. *See, e.g.*, *Zelman*, 536 U.S. at 645 (state tuition grants to parents for public or private schools); *Nyquist*, 413 U.S. at 781 (state tuition grants to parents for private schools). Although we acknowledge that "the

[c]ourt's exercise of jurisdiction . . . is not precedent for the existence of jurisdiction," *Doe v. Madison Sch. Dist. No. 321*, 177 F.3d 789, 795 (9th Cir. 1999) (en banc) (internal quotation marks omitted; alteration in original), we also note that the Court has rejected the suggestion that its consistent past practice of exercising jurisdiction amounts to "mere 'sub silentio holdings' " that "command no respect," *Hibbs*, 542 U.S. at 94. We therefore hold that plaintiffs have standing as taxpayers to challenge Section 1089 for allegedly violating the Establishment Clause.

## II.    The Establishment Clause

**[6]** "The Establishment Clause of the First Amendment, applied to the States through the Fourteenth Amendment, prevents a State from enacting laws that have the 'purpose' or 'effect' of advancing or inhibiting religion."[9] *Zelman*, 536

---

[9]Defendants argue that plaintiffs' as-applied challenge is barred by "res judicata" in light of *Kotterman*. In *Hibbs v. Winn*, however, the Supreme Court observed that "*Kotterman*, it is undisputed, has no preclusive effect on the instant as-applied challenge to § 43-1089 brought by different plaintiffs." 542 U.S. at 95. Insofar as we are free to call this observation into question, we nonetheless find defendants' argument unpersuasive.

Under the full-faith-and-credit statute, 28 U.S.C. § 1738, "[w]e give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Coeur D'Alene Tribe of Idaho v. Hammond*, 384 F.3d 674, 688 (9th Cir. 2004) (internal quotation marks omitted). *Kotterman* upheld Section 1089 on a facial challenge before the statute was implemented. Plaintiffs allege that Section 1089 violates the Establishment Clause because STOs have not provided scholarships in a way that is neutral toward religion and that offers parents true private choice; this allegation is predicated on evidence that was not available prior to Section 1089's implementation. Plaintiffs' as-applied challenge thus does not, as defendants argue, implicate Arizona's doctrine of virtual representation. *See El Paso Natural Gas Co. v. State*, 599 P.2d 175, 178 (Ariz. 1979). Arizona law bars cases under res judicata only where "*no additional evidence* is needed to prevail in the second action than that needed in the first." *Phoenix Newspapers, Inc. v. Dep't of Corr.*, 934 P.2d 801, 804 (Ariz. App. 1997) (emphasis added). In

U.S. at 648-49 (citing *Agostini v. Felton*, 521 U.S. 203, 222-23 (1997)).

## A.    Secular Purpose

The first prong of this standard requires us to consider whether the statute was "enacted for . . . [a] valid secular purpose." *Id.* at 649. "[A]lthough a legislature's stated reasons will generally get deference, the secular purpose required has to be genuine, not a sham, and not merely secondary to a religious objective." *McCreary County, Ky v. ACLU*, 545 U.S. 844, 864 (2005).

[7] The legislative history of Section 1089 shows that its primary sponsor's concern in introducing the bill was providing equal access to a wide range of schooling options for students of every income level by defraying the costs of educational expenses incurred by parents. *See* Ariz. House of Rep. Comm. on Ways & Means, Minutes of Meeting, Tues. Jan. 21 1997. Plaintiffs do not contest that this purpose, if genuine, is both secular and valid. Plaintiffs argue, however, that Section 1089's design and scope reveal this purpose to be a sham. Specifically, plaintiffs argue that Section 1089's operation shows that the program, which provides aid only to students who attend private schools, was enacted not to give low-income children a meaningful opportunity to attend those schools, but to advance the legislature's religious aims.

---

determining whether a program's secular purpose is genuine, and whether a program has the primary effect of advancing religion, we may consider additional evidence as to how the program operates in reality. *See, e.g.*, *McCreary County, Ky. v. ACLU*, 545 U.S. 844, 862 (2005) (holding the "implementation of the statute, or comparable official act" are relevant in examining a program's secular purpose (internal quotation marks omitted)). We therefore agree with the Supreme Court that "*Kotterman* . . . has no preclusive effect on the instant as-applied challenge . . . ." *Hibbs*, 542 U.S. at 95.

**[8]** Plaintiffs are correct that the nature of a program's operation may, in some instances, reveal its ostensible purpose to be a sham. *See McCreary*, 545 U.S. at 862 (stating that, in some cases, "the government action itself bespoke the purpose" of a program that violated the Establishment Clause) (citing *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 223-24 (1963)). As the Court held in *McCreary*, the inquiry whether a program's putative purpose is genuine and "not merely secondary to a religious objective," *id.* at 864, is undertaken from the perspective of "an 'objective observer,' one who takes account of the traditional external signs that show up in the 'text, legislative history, and implementation of the statute,' or comparable official act." *Id.* at 862 (quoting *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 308 (2000) (internal quotation marks omitted)). Plaintiffs' allegations concerning Section 1089's operation are therefore relevant to whether the program has a genuine secular purpose.

As we discussed above, for example, Section 1089 could, on its face, be interpreted to require each STO to provide scholarships for use at any qualified private school, religious or secular. Plaintiffs allege, however, that in practice STOs are permitted to restrict the use of their scholarships to use at certain religious schools. Such allegations, if proved, could belie defendants' claim that Section 1089 was enacted primarily to provide Arizona students with equal access to a wide range of schooling options.

**[9]** At the same time, we are mindful of the Supreme Court's "reluctance to attribute unconstitutional motives to the states, particularly when a plausible secular purpose for the state's program may be discerned from the face of the statute." *Mueller*, 463 U.S. at 394-95. The Court has held that programs that direct benefits *exclusively* to private schools, as Section 1089 does, may be "adequately supported by legitimate, nonsectarian interests," including "promoting pluralism and diversity among [the state's] public and nonpublic schools." *Nyquist*, 413 U.S. at 773. The question before us,

however, is not whether Section 1089 in fact has a genuine, secular purpose, but whether plaintiffs could prove, on the facts alleged in the complaint, that it does not. Accordingly, we conclude that plaintiffs' allegations, if accepted as true, leave open the possibility that plaintiffs could reveal the legislature's stated purpose in enacting Section 1089 to be a pretense.

## B. Effect

We next consider whether Section 1089 "has the forbidden 'effect' of advancing or inhibiting religion." *Zelman*, 536 U.S. at 649. In "refin[ing] the definition of governmental action that unconstitutionally advances religion," the Supreme Court has "paid particularly close attention to whether the challenged governmental practice either has the purpose or effect of 'endorsing' religion, a concern that has long had a place in our Establishment Clause jurisprudence." *County of Allegheny v. ACLU*, 492 U.S. 573, 592 (1989). Guided by the Court's opinion in *Zelman*, we conclude, for reasons set forth below, that plaintiffs have alleged facts sufficient to state an as-applied Establishment Clause claim under this endorsement test.

Section 1089 is an indirect aid program, under which the state gives tax credits to individuals who contribute to STOs, which in turn use the money to provide private school scholarships. Plaintiffs allege that many of these STOs in fact exist to promote the funding of religious education. If the state of Arizona were to allocate funds directly to these religious STOs, the state would plainly violate the Establishment Clause. *See Bowen*, 487 U.S. at 609-10 (noting that "direct government aid" impermissibly advances religion "if the aid flows to institutions that are 'pervasively sectarian' "). As defendants correctly argue, however, STOs are private charitable organizations — albeit funded by taxpayer contributions

that the state will reimburse through dollar-for-dollar tax credits.[10]

[10] We nevertheless hold that if plaintiffs' allegations are accepted as true, Section 1089 violates the Establishment Clause by delegating to taxpayers a choice that, from the perspective of the program's aid recipients, "deliberately skew[s] incentives toward religious schools." *Zelman*, 536 U.S. at 650; *see id.* at 652 (emphasizing that in the educational assistance programs the Court has upheld, "[t]he incidental advancement of a religious mission, or the perceived endorsement of a religious message, is reasonably attributable to the individual recipient, not to the government, whose role ends with the disbursement of benefits"). In practice, plaintiffs allege, the choice delegated to taxpayers under Section 1089 channels a disproportionate amount of government aid to sectarian STOs, which in turn limit their scholarships to use at religious schools.[11] The scholarship program thus skews aid in favor of religious schools, requiring parents who would prefer a secular private school but who cannot obtain aid from the few available nonsectarian STOs to choose a religious school to obtain the perceived benefits of a private school education. Accordingly, Section 1089's delegation to taxpayers operates to deprive these parents, as the program's aid recipients, of " 'genuinely independent and private choices' " to direct the program aid to secular schools. *Id.* at 651 (quoting *Witters v. Wash. Dep't of Servs. for the Blind*, 474 U.S. 481, 487

---

[10]Plaintiffs do not argue that STOs are state actors, so we do not decide whether the STOs' conduct, in itself, could support an Establishment Clause claim.

[11]This allegation is distinct from plaintiffs' contention that Section 1089's design reveals its putative secular purpose to be a sham. As we shall discuss below, the Supreme Court has frequently held that state policies enacted for a valid secular purpose violate the Establishment Clause when they are not effectively designed to achieve that purpose. *See, e.g.*, *Nyquist*, 413 U.S. at 788 ("In its attempt to enhance the opportunities of the poor to choose between public and nonpublic education, the State has taken a step which can only be regarded as one 'advancing' religion.").

(1986)). Unlike indirect aid programs the Supreme Court has upheld, Section 1089 is not a "neutral program of private choice," and a reasonable observer could therefore conclude that the aid reaching religious schools under this program "carries with it the *imprimatur* of government endorsement." *Id.* at 655.

Defendants dispute this conclusion on two grounds: First, that as private institutions who do not receive direct government funding, they are no different from other nonprofit, religious institutions that are funded through tax-deductible contributions. Second, that under the program, "government aid reaches religious schools only as a result of the genuine and independent choices of private individuals." *Zelman*, 536 U.S. at 649. We address each of these arguments in turn.

## 1. Aid to Private Institutions

Defendants first argue that because STOs do not receive direct government funding, Section 1089 is no different from other programs that accord tax benefits to individuals who contribute to nonprofit, religious institutions. *See, e.g., Hernandez v. Comm'r*, 490 U.S. 680, 695 (1989) (upholding federal tax deduction for contributions to charitable and religious organizations); *see also Walz*, 397 U.S. at 666-67 (upholding state property tax exemption for religious and secular nonprofit organizations). As with any program of government aid, however, whether such programs violate the Establishment Clause depends on whether they have "either . . . the purpose or effect of 'endorsing' religion." *County of Allegheny*, 492 U.S. at 592; *see Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 17 (1989) (plurality opinion) (holding sales tax exemption exclusively available to religious periodicals violated Establishment Clause because it "lack[ed] a secular objective that would justify this preference along with similar benefits for nonreligious publications or groups, and because it effectively endorses religious belief"); *Nyquist*, 413 U.S. at 783 (holding program including grants and tax deductions for private

school tuition had valid secular purpose, but violated Establishment Clause because "the effect of the aid [wa]s unmistakably to provide desired financial support for nonpublic, sectarian organizations"). The parallels defendants contend exist between Section 1089 and tax deduction programs that the Supreme Court has held "easily pass[ ] constitutional muster," *Hernandez*, 490 U.S. at 695, are therefore instructive, but only to the extent they shed light on the secular objectives, if any, that Section 1089 was enacted to promote.

**[11]** The secular objectives defendants argue Section 1089 promotes differ significantly from those advanced by tax deduction programs the Supreme Court has upheld. The federal system addressed in *Hernandez*, for example, permits tax deductions for "any charitable contribution" to a qualified entity "organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or to foster national or international amateur sports competition." 26 U.S.C. §§ 170(a), (c)(2)(B); *see also Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 544 (1983) (observing Congress' system of tax deductions and exemptions provides "subsidy to non profit civic welfare organizations generally"). This system, the Court held, makes deductions available for contributions to an array of religious and secular organizations, and thus has "the primary effect of . . . encouraging gifts to charitable entities, including but not limited to religious organizations." *Hernandez*, 490 U.S. at 696. Section 1089, by contrast, offers narrowly targeted, dollar-for-dollar tax credits designed to fully reimburse contributions to STOs, most of which restrict recipients' choices about how to use their scholarships. Although defendants contend these credits were enacted to provide Arizona schoolchildren equal access to a wide range of schooling options, defendants do not — and could not — suggest the credits are designed to promote donations of individual wealth or charitable giving to a broad array of institutions.[12] Likewise, defendants do not suggest

---

[12]As the Court recognized in *Hernandez*, 490 U.S. at 696, tax deductions promote the secular purpose of encouraging individuals to use their

that Section 1089 has a secular purpose in common with laws granting tax exemptions to a broad range of nonprofit organizations, including churches. *See Walz*, 397 U.S. at 672-75 (holding law granting property tax exemptions to array of religious and secular nonprofit institutions served to promote "beneficial and stabilizing influences in community life" and minimize "[t]he hazards of churches supporting government"); *see also id.* at 678 (noting the "unbroken practice of according . . . exemption[s] to churches, openly and by affirmative state action, not covertly or by state inaction, is not something to be lightly cast aside"). Thus, we are not persuaded that Section 1089 conforms with the Establishment Clause simply because it bears some superficial resemblance to programs that do.

---

own private wealth to make charitable gifts. By contrast, the one-to-one tax credits offered under Section 1089 encourage individuals to give money to private STOs, but allow them to obtain full reimbursement from the state for their contributions. *See Nyquist*, 413 U.S. at 789 (explaining that "the usual attribute of a tax credit" is that it is "designed to yield a predetermined amount of tax 'forgiveness' in exchange for performing a specific act which the State desires to encourage"). In this respect, the tax credits offered under Section 1089 resemble those that encourage individuals to provide public financing for the Federal Election Commission's Presidential Election Campaign Fund ("PECF") but which do not, by design, encourage private charitable donations to the PECF. *See* 26 U.S.C. §§ 9001-13. As we explained in our prior opinion in this litigation:

> a tax credit differs from a tax deduction in that where a tax deduction is involved, giving money to a religious institution is not, as is the case of a tax credit, a free gift. In the case of a tax credit, the taxes due are reduced by the full amount of the gift. In contrast, when a taxpayer is entitled to a tax deduction, the taxpayer must in most if not all instances still pay a majority of the tax involved: it is only his taxable income that is reduced by the amount of the gift, and, thus, his tax liability is reduced only by a percentage of the gift that is equal to the tax rate applicable to his income bracket.

*Winn v. Killian*, 307 F.3d at 1015 n.5, *aff'd Hibbs v. Winn*, 542 U.S. 88. The tax credits offered under Section 1089 therefore do not promote the same secular purpose as the tax deductions upheld in *Hernandez*.

## 2.   Private Choice

The Supreme Court has "drawn a consistent distinction between government programs that provide aid directly to religious schools, and programs of true private choice, in which government aid reaches religious schools only as a result of the genuine and independent choices of private individuals." *Zelman*, 536 U.S. at 649 (citations omitted). Defendants argue that Section 1089, like other religiously neutral educational assistance programs the Supreme Court has found constitutional, is a "program of true private choice . . . and [is] thus constitutional." *Id.* at 653.

The nature of the choices provided under Section 1089, however, differs significantly in structure from those under educational assistance programs the Court has held to be "programs of true private choice."[13] *Id.* In each of those programs, the government "provid[ed] assistance directly" to parents or individual students, "who, in turn, direct[ed] the government aid to religious schools wholly as a result of their own genuine and independent private choice." *Id.* at 652. Under the voucher program upheld in *Zelman*, for example, the state distributed tuition aid directly to eligible parents, who were free to use the aid to send their children to any participating public or private school, and those wishing their children to remain enrolled in public school received tutorial aid to accommodate that choice. *Id.* at 645.

Under Section 1089, by contrast, the state does not provide aid directly to parents. Instead the aid is mediated first through taxpayers, and then through private scholarship pro-

---

[13]*See Zelman*, 536 U.S. 639; *Zobrest v. Catalina Foothills Sch. Dist.*, 509 U.S. 1 (1993) (upholding federal program providing sign-language interpreter to student attending Catholic school); *Witters*, 474 U.S. 481 (upholding state vocational assistance program paying state aid directly to student attending religious college); *Mueller*, 463 U.S. 388 (upholding state tax deduction available to parents for their children's public and private school expenses).

grams. Under Section 1089, all Arizona taxpayers are eligible for a tuition tax credit, and those whose tax liability is large enough to use the credit may apply it toward a contribution to any STO, regardless of whether that STO provides scholarships exclusively for use at religious schools. In turn, any Arizona parent who wishes to send her child to a private school may apply for a STO scholarship, provided that the child meets the STO's eligibility criteria for the use of that scholarship.

[12] Unlike parents' choices under the program in *Zelman*, or aid recipients' choices under other programs the Court has upheld, parents' choices are constrained by those of the taxpayers exercising the discretion granted by Section 1089. For example, by choosing to give state-reimbursed money to the Catholic Tuition Organization of the Diocese of Phoenix, which plaintiffs allege to be the largest STO, taxpayers can make their portion of the program aid available only to parents who are willing to send their children to Catholic schools. Although anyone may form a new STO devoted to funding scholarships at secular private schools, Section 1089 prohibits taxpayers from earmarking contributions for their own children. Thus, it is taxpayers who decide which STOs to fund and, consequently, who is eligible to receive STO-provided scholarships according to the criteria of the designated STO.

Defendants acknowledge the differences between parents' choices under Section 1089 and those afforded under indirect aid programs that the Supreme Court has previously upheld. They contend, however, that because Section 1089 offers "genuine and independent choices" to the taxpayers who fund STOs, these differences are irrelevant to whether Section 1089 violates the Establishment Clause. We disagree.

### a. Parental choice

The parties do not contest that notwithstanding its structural differences from indirect aid programs the Court has upheld,

Section 1089 would satisfy the Establishment Clause if the program made scholarships available to parents on a religiously neutral basis and gave them a true private choice as to where to utilize the scholarships. Plaintiffs allege, however, this is not how the program works in practice. In *Zelman*, the Court identified several circumstances relevant to whether the indirect aid program at issue, which gave tuition grants to parents to apply toward private and fee-charging public schools, was "a program of true private choice . . . and thus constitutional[:]"

> [T]he . . . program is neutral in all respects toward religion. It is part of a general and multifaceted undertaking . . . to provide educational opportunities to the children of a failed school district. It confers educational assistance directly to a broad class of individuals defined without reference to religion, *i.e.*, any parent of a school-age child who resides in the . . . School District. The program permits the participation of *all* schools within the district, religious or nonreligious. Adjacent public schools also may participate and have a financial incentive to do so. *Program benefits are available to participating families on neutral terms, with no reference to religion.* The only preference stated anywhere in the program is a preference for low-income families, who receive greater assistance and are given priority for admission at participating schools.
>
> There are *no financial incentives that skew the program toward religious schools.* Such incentives are not present . . . where the aid is *allocated on the basis of neutral, secular criteria* that neither favor nor disfavor religion, and *is made available to both religious and secular beneficiaries on a nondiscriminatory basis.*

*Id.* at 653-54 (emphasis added) (citations, alterations and internal quotation marks omitted).

Under this rubric, Section 1089 falls short. The vast majority of the scholarship money under the program — over 85 percent as of the time of plaintiffs' complaint — is available only for use at religious schools.[14] Because this aid is available only to parents who are willing to send their children to a religious school, the program fails to "confer[ ] educational assistance directly to a broad class of individuals defined without reference to religion." *Id*. at 653. Moreover, because a disproportionate amount of the program aid is earmarked for use at religious schools *before* parents receive the aid, Section 1089 is not, from the parents' perspective, "neutral in all respects toward religion" and does not equally "permit[ ] the participation of *all* schools . . . religious or nonreligious" in the program. *Id.* Additionally, because Section 1089 does not make aid equally available to parents "on the basis of neutral, secular criteria that neither favor nor disfavor religion," *id.* (alterations in original) (quoting *Witters*, 474 U.S. at 487-88), the program creates " 'financial incentive[s]' " for parents that " 'ske[w]' the program toward religious schools." *Id.* (quoting *Witters*, 474 U.S. at 487-88); *see Zobrest*, 509 U.S. at 10 (upholding program because it "create[d] no financial incentive for parents to choose a sectarian school"). Thus, parents who wish to place their children in a private secular school, but who could not otherwise afford to do so, are at a disadvantage compared to parents who are willing to accept a scholarship for private religious schooling —

---

[14]We recognize the Supreme Court in *Mueller*, 463 U.S. at 401, cautioned that such statistics lack constitutional import when a law is facially neutral. This case is different from *Mueller*, however, because Section 1089 does not allocate scholarship funds based on *parents'* choices of schools, but instead mediates financial aid through *taxpayers'* allocations to scholarship programs of their choice. As a result, a parent seeking scholarship aid does not have a "genuine and independent private choice" under the program because the parent's choices are constrained by those of taxpayers. *Zelman*, 536 U.S. at 652. Facts showing the skewed concentration of funds in sectarian school scholarship programs would therefore support the claim that parents are financially incentivized to choose a religious school.

either by choice or out of financial necessity. Although parents would, of course, have the option of leaving their children in public school, we reject the suggestion that the mere existence of the public school system guarantees that any scholarship program provides for genuine private choice. For parents wait-listed for scholarships to secular schools,[15] the range of educational choices the STO-administered scholarship programs offer do not realistically include "obtain[ing] a scholarship and choos[ing] a nonreligious private school." *Zelman*, 536 U.S. at 655. Section 1089, as applied, thereby creates incentives that pressure these parents into accepting one of the scholarships that are readily available under the program for use at a religious school. Therefore, Section 1089, as applied, "fails to provide genuine opportunities for . . . parents to select secular educational options for their school-age children." *Id.*

### b. Taxpayer choice

Defendants argue that despite this failure, Section 1089 does not violate the Establishment Clause because it provides a tax credit to all Arizona *taxpayers*, without respect to religion, and gives taxpayers a genuine choice between directing their money to religious or secular STOs. Therefore, as *Zelman* requires, "government aid reaches religious schools only as a result of the genuine and independent choices of private individuals." *Id.* at 649. Plaintiffs do not contest that Section 1089 is neutral with respect to the taxpayers who direct money to STOs, or that any of the program's aid that reaches

---

[15]Data in the record, the veracity of which defendants do not challenge, show that in 2004, the Arizona School Choice Trust — the largest of the STOs that provides scholarships to *any* private secular or religious school — reported a waiting list of at least 700 students. If accurate, it would be the kind of information that would further support plaintiffs' allegation that "parents choosing to send their children to non-religious, non-public schools may be unable to locate an STO willing and able to make a tuition grant to a student attending the non-religious school of the parents' choice."

a STO does so only as a result of the genuine and independent choice of an Arizona taxpayer. *See Mueller*, 463 U.S. at 398-99. Plaintiffs argue, however, that Section 1089 violates the Establishment Clause precisely *because* the individual taxpayers' choices available under the program serve to restrict parents' opportunities to select secular educational options for their school-age children, skewing parents' incentives to send their children to religious schools. As such, the program is not "neutral in all respects toward religion" and, concomitantly, is not a "program of true private choice." *Zelman*, 536 U.S. at 653.

Defendants argue that it is irrelevant, under *Zelman*, whether an indirect aid program offers true private choice to parents, or instead, like Section 1089, offers true private choice to another broadly defined class of individuals. In describing what constitutes "true private choice," however, the Court in *Zelman* frequently emphasized that the choice is one offered, on a neutral basis, to *parents* or *students*, as the beneficiaries of the program's aid. *See, e.g., id.* at 652 ("A program . . . [like those the Court has upheld] permits government aid to reach religious institutions only by way of the deliberate choices of numerous individual recipients."); *id.* at 653 (concluding one of the features of "true private choice" in the Ohio voucher program is that "[p]rogram benefits are available to participating families on neutral terms"); *id.* at 669 (O'Connor, J., concurring) ("Courts are instructed to consider two factors: first, whether the program administers aid in a neutral fashion, without differentiation based on the religious status of beneficiaries or providers of services; second, and more importantly, whether beneficiaries of indirect aid have a genuine choice among religious and nonreligious organizations when determining the organization to which they will direct that aid."). Defendants contend this emphasis is simply because parental choice was the *only* private choice offered under those programs.

Defendants' argument, however, disregards the Court's analysis of *how* the true private choice described in *Zelman*

ensures that government aid flowing to religious institutions does not have "the forbidden 'effect' of advancing . . . religion,' " *id.* at 649, even though the aid would have such an effect under a program of direct funding. *See Bowen*, 487 U.S. at 609-10 (noting "direct government aid" impermissibly advances religion "if the aid flows to institutions that are 'pervasively sectarian' "). The function of true private choice, the Court explained, is to eliminate the perception that the government is endorsing religion through the money that is channeled to sectarian institutions: "The incidental advancement of a religious mission, or the perceived endorsement of a religious message, is reasonably attributable to the individual recipient, not to the government, whose role ends with the disbursement of benefits." *Zelman*, 536 U.S. at 652. The Court expressly linked its "true private choice" analysis to the "reasonable observer" inquiry as to whether the government is perceived to endorse the religious organizations that benefit from its aid. *See id.* at 655 (holding, with respect to the parental choice the Court was addressing, that "no reasonable observer would think a neutral program of private choice, where state aid reaches religious schools solely as a result of the numerous independent decisions of private individuals, carries with it the *imprimatur* of government endorsement").

In drawing this link, the Court adopted Justice O'Connor's position in *Mitchell v. Helms*, 530 U.S. 793 (2000), that " '[i]n terms of public perception, a government program of direct aid to religious schools . . . differs meaningfully from the government distributing aid directly to individual students who, in turn, decide to use the aid at the same religious schools.' " *Zelman*, 536 U.S. at 655 (quoting *Mitchell*, 530 U.S. at 842-43 (O'Connor, J., concurring in judgment)). Under this framework, the question central to the endorsement inquiry is whether "the reasonable observer would naturally perceive the aid program [in question] as *government* support for the advancement of religion." *Mitchell*, 530 U.S. at 843 (O'Connor, J., concurring in the judgment) (discussing effect of programs providing direct aid to religious schools).

" '[T]he reasonable observer in th[is] endorsement inquiry must be deemed aware' of the 'history and context' underlying a challenged program." *Zelman*, 536 U.S. at 655 (quoting *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 119 (2001) (internal quotation marks omitted)); *see also Capitol Square Review and Advisory Bd. v. Pinette*, 515 U.S. 753, 773 (1995) (O'Connor, J., concurring in part and concurring in judgment) ("[T]he endorsement test necessarily focuses upon the perception of a reasonable, *informed* observer.") (emphasis added). We impute this knowledge to the reasonable observer because "the endorsement inquiry is not about the perceptions of particular individuals or saving isolated nonadherents from . . . discomfort," but instead concerns "the political community writ large." *Id.* at 779; *accord Good News Club*, 533 U.S. at 119 (adopting this position); *see also Capitol Square*, 515 U.S. at 779-80 (O'Connor, J., concurring in part and concurring in judgment) ("[T]he applicable observer is similar to the 'reasonable person' in tort law, who is not to be identified with any ordinary individual, who might occasionally do unreasonable things, but is rather a personification of a community ideal of reasonable behavior, determined by the [collective] social judgment.") (internal quotation marks omitted; alteration in original).

**[14]** Accordingly, to assess whether the taxpayer choice offered under Section 1089 has the same constitutional effect as the parental choice *Zelman* upheld, we must consider the Court's application of the reasonable observer inquiry to the program at issue in that case. Specifically, we must consider the circumstances the Court deemed relevant to *why* a reasonable, informed observer looking at the program upheld in *Zelman* would conclude that "[t]he incidental advancement of a religious mission, or the perceived endorsement of a religious message" resulting from a program "is reasonably attributable to the individual recipient, not to the government, whose role ends with the disbursement of benefits." 536 U.S. at 652. The Court's guidance in earlier cases also sheds light on two cir-

cumstances that seemed particularly important to the reasonable observer analysis in *Zelman*.

First, a reasonable, informed observer would consider what role the person making the choice occupies in the structure of the program. *See Larkin v. Grendel's Den, Inc.*, 459 U.S. 116, 127 (1982) (holding statute allowing a church or school to veto a liquor license for establishments in their proximity violated the Establishment Clause); *Zelman*, 536 U.S. at 652. In *Larkin*, the Court determined there was no " 'effective means of guaranteeing' " the veto power delegated to churches over liquor licenses " '[would] be used exclusively for secular, neutral, and nonideological purposes.' " *Id.* at 125 (quoting *Nyquist*, 413 U.S. at 780).[16] "In addition," the Court continued, "the mere appearance of a joint exercise of legislative authority by Church and State provides a significant symbolic benefit to religion in the minds of some by reason of the power conferred." *Id.* at 125-26. Of course, the delegation of scholarship funding to individual taxpayers, such as in Section 1089, does less to promote religion than the delegation of zoning authority to churches. *Larkin*'s holding, however, illustrates that when a statute delegates "a power ordinarily vested in agencies of government" to a private party, *see id.* at 122, without reasonable assurance that the party's choices will advance the secular purposes of the statute, any ensuing "perceived endorsement of a religious message" may be "reasonably attribut[ed]" to the government. *See Zelman*, 536 U.S. at 652.

---

[16]In *Zelman*, the Court held "*Nyquist* does not govern neutral educational assistance programs that, like the program here, offer aid directly to a broad class of individual recipients defined without regard to religion." 536 U.S. at 662. As discussed above, Section 1089 does not "offer aid directly to individual recipients," but rather mediates the aid through taxpayers and STOs. Insofar as Section 1089 is not a "program of true private choice," within the meaning of *Zelman*, the Court's holding in *Nyquist* is relevant to determining whether a reasonable observer would conclude the tax credit program endorses religion.

By contrast, the educational assistance programs addressed in *Zelman* were structured so that parents were permitted to choose how to best use the program aid to assist *their* children. The parents' decisive role in the program gave them incentives to apply the program's aid based on their children's educational interests instead of on sectarian considerations, such as whether to promote the religious mission of a particular school. Accordingly, by delegating a choice that "ensured that parents were the ones to select a religious school as the best learning environment" for their children, the government did not appear to endorse religion. *Id.* (stating how federal special education program providing sign-language interpreter to student attending Catholic school ensured that "the circuit between government and religion was broken, and the Establishment Clause was not implicated").

Second, a reasonable, informed observer would consider whether the choice delegated under a program has the effect of promoting, or hindering, the program's secular purpose. *See id.* at 655. In *Larkin*, the Court recognized that the statute delegating veto power to churches and schools had the valid secular purpose of "protect[ing] spiritual, cultural, and educational centers from the 'hurly-burly' associated with liquor outlets." 459 U.S. at 123 (internal quotation marks omitted). The Court noted, however, that "these valid secular objectives can be readily accomplished by other means," *id.* at 123-24, and that the veto power conferred by the statute could "be used by churches to promote goals beyond insulating the church from undesirable neighbors," *id.* at 125. The Court concluded that the delegation could "be seen as having a 'primary' and 'principal' effect of advancing religion." *Id.* at 126. Similarly, in *Nyquist*, the Court invalidated a program providing tuition grants and tax credits to parents sending their children to private schools because, although the program had a valid secular purpose, "the effect of the aid [wa]s unmistakably to provide desired financial support for nonpublic, sectarian institutions." 413 U.S. at 783; *see id.* at 788 ("In its attempt to enhance the opportunities of the poor to choose

between public and nonpublic education, the State has taken a step which can only be regarded as one 'advancing' religion."). *Nyquist* illustrates that if an educational assistance program provides individual choice through tax credits, but those tax credits hinder the program's ability to achieve its valid secular goals, a reasonable observer could well conclude that the tax credits are simply masking an Establishment Clause violation. *Cf. Hibbs v. Winn*, 542 U.S. at 93-94 (discussing school desegregation cases invalidating use of tuition grants and tax credits to circumvent *Brown v. Board of Education*, 347 U.S. 483 (1954)); s*ee also Bd. of Educ. of Kiryas Joel v. Grumet*, 512 U.S. 687, 690 (1994) (invalidating statute creating school district coextensive with religious community that had valid purpose of providing special education services, but was unnecessarily tailored to promote sectarian aims); *Norwood v. Harrison*, 413 U.S. 455, 465 (1973) ( "[I]t is . . . axiomatic that a state may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish.") (internal quotation marks omitted) (invalidating state program providing textbooks to racially discriminatory private schools).

**[15]** The choices delegated to parents under *Zelman*, by contrast, may have advanced — and at least did not thwart — the secular purpose of the program, which was to "provid[e] educational assistance to poor children in a demonstrably failing public school system." 536 U.S. at 649. The best educational environment for a particular child within a failed school system may depend on qualitative considerations that could not easily be assessed at a policymaking level. *See, e.g.*, *id.* at 674-75 (O'Connor, J., concurring) (suggesting metrics other than formal academic achievement that may play a role in parents' educational choices in a failed school district). The choice offered under the program may have therefore helped ensure that the program achieved its secular aims by delegating funding decisions to a class of persons — parents — who were better positioned than a state policymaking body to

make educational choices for individual students in a failing school system.

**[16]** Drawing upon these two circumstances — the role the person making the choice occupies in the structure of a program and whether delegating the choice promotes the secular purpose of the program — we turn to defendants' argument that the individual, *taxpayer* choice provided under Section 1089 necessarily has the same constitutional effect as the parental choice upheld in *Zelman*. Under Section 1089, individual taxpayers may constrain the scholarship options of other parents' children by choosing to direct their state-reimbursed contributions to sectarian STOs. Yet unlike parents, whose choices directly affect their children, taxpayers have no structural incentives under Section 1089 to direct their contributions primarily for secular reasons, such as the academic caliber of the schools to which a STO restricts aid, rather than for sectarian reasons, such as the religious mission of a particular STO. Thus, the taxpayers' position in the structure of Section 1089 provides no " 'effective means of guaranteeing' " that taxpayers will refrain from using the program for sectarian purposes. *Larkin*, 459 U.S. at 125 (quoting *Nyquist*, 413 U.S. at 780). Significantly, plaintiffs' allegations suggest the taxpayers' role in the structure of Section 1089, as applied, *encourages* them to use the tax credits to promote sectarian goals, and that taxpayers have in fact used the program aid to this end.

**[17]** Relatedly, the taxpayer choice provided under Section 1089 does little to advance — indeed, it appears to thwart — the secular purpose of the program, which is to provide equal access to a wide range of schooling options for students of every income level by defraying the costs of educational expenses incurred by parents.[17] Defendants do not suggest

---

[17]Even if we assumed that taxpayer choice does, in some respect, advance the secular objectives of Section 1089, plaintiffs may be able to demonstrate that "these valid secular objectives can be readily accomplished by other means," and therefore that the program nevertheless "could be seen as having a 'primary' and 'principal' effect of advancing religion." *Larkin*, 459 U.S. at 123-24, 126.

taxpayers are better positioned than government administrators to allocate program aid in a manner that will expand schooling options, and plaintiffs' allegations suggest the demand for STO-provided scholarships available for use at secular schools markedly outstrips their supply. This misalignment between parents' interests and taxpayers' desires suggests that by vesting individual taxpayers with funding authority, Section 1089's design works against its purpose of providing Arizona students with *equal* access to a wide range of schooling options. Although Section 1089 leaves individual parents free to create new STOs that cater to their educational preferences, this freedom provides little benefit to parents who do not have the time or capital to get others to support their STO, given that these parents cannot use their tax credits to fund scholarships for their own children.

[18] Accordingly, we conclude that there is a meaningful constitutional distinction between the individual, taxpayer choice provided under Section 1089 and the parental choice upheld in *Zelman*.[18] Section 1089, as claimed to operate in practice, is not a program of true private choice, immune from further constitutional scrutiny. We therefore hold that plaintiffs have alleged facts upon which a reasonable, informed observer could conclude that Section 1089, as applied, violates the Establishment Clause even though the state does not directly decide whether any particular sectarian organizations will receive program aid.

---

[18] In *Green v. Garriott*, ___ P.3d ___, 2009 WL 623346 (Ariz. Ct. App. March 12, 2009), the Arizona Court of Appeals in a 2-1 decision rejected an Establishment Clause challenge to Ariz. Rev. Stat. § 43-1183, which gives dollar-for-dollar tax credits to corporations for contributions to STOs. The *Green* majority did not consider, as we do here, whether any lack of religious neutrality in the actual operation of Section 1183 "carries with it the *imprimatur* of government endorsement," *Zelman*, 536 U.S. at 655, and we are unpersuaded by the analysis of whether § 1183 is a program of "true private choice" for the reasons we have already discussed at length.

The district court's order dismissing plaintiffs' complaint is reversed and remanded for further proceedings consistent with this opinion.

**REVERSED and REMANDED for further proceedings.**