(Slip Opinion) OCTOBER TERM, 2010 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## ARIZONA CHRISTIAN SCHOOL TUITION ORGANIZA-TION *v.* WINN ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 09–987. Argued November 3, 2010—Decided April 4, 2011*

Respondents, Arizona taxpayers, sued petitioner Director of the State Department of Revenue, challenging Ariz. Rev. Stat. Ann. §43–1089 on Establishment Clause grounds. The Arizona law gives tax credits for contributions to school tuition organizations, or STOs, which then use the contributions to provide scholarships to students attending private schools, including religious schools. Petitioner Arizona Christian School Tuition Organization and others later intervened. The District Court dismissed the suit for failure to state a claim. Reversing, the Ninth Circuit held that respondents had standing as taxpayers under *Flast* v. *Cohen*, 392 U. S. 83, and had stated an Establishment Clause claim.

*Held:* Because respondents challenge a tax credit as opposed to a governmental expenditure, they lack Article III standing under *Flast* v. *Cohen*, *supra*. Pp. 4–19.

 (a) Article III vests in the Federal Judiciary the "Power" to resolve "Cases" and "Controversies." That language limits the Federal Judiciary to the traditional role of Anglo-American courts: redressing injuries resulting from a specific legal dispute. To obtain a ruling on the merits in federal court a plaintiff must assert more than just the "generalized interest of all citizens in constitutional governance." *Schlesinger* v. *Reservists Comm. to Stop the War*, 418 U. S. 208, 217. Instead the plaintiff must establish standing, which requires "an 'injury in fact'"; "a causal connection between the injury and the conduct

————————

*Together with No. 09–991, *Garriott, Director, Arizona Department of Revenue* v. *Winn et al.,* also on certiorari to the same court.

complained of"; and a conclusion that it is "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 560–561. Pp. 4–6.

(b) In general, the mere fact that someone is a taxpayer does not provide standing to seek relief in federal court. The typical assertion of taxpayer standing rests on unjustifiable economic and political speculation. See *Frothingham* v. *Mellon*, 262 U. S. 447; *Doremus* v. *Board of Ed. of Hawthorne*, 342 U. S. 429. When a government expends resources or declines to impose a tax, its budget does not necessarily suffer. Even assuming the State's coffers are depleted, finding injury would require a court to speculate "that elected officials will increase a taxpayer-plaintiff's tax bill to make up a deficit." *DaimlerChrysler Corp.* v. *Cuno*, 547 U. S. 332, 344. And to find redressability a court must assume that, were the taxpayers' remedy allowed, "legislators [would] pass along the supposed increased revenue in the form of tax reductions." *Ibid.* These conclusions apply to the present cases. The costs of education may be a significant portion of Arizona's annual budget, but the tax credit, by facilitating the operation of both religious and secular private schools, could relieve the burden on public schools and provide cost savings to the State. Even if the tax credit had an adverse effect on Arizona's budget, problems would remain. To find a particular injury in fact would require speculation that Arizona lawmakers react to revenue shortfalls by increasing respondents' tax liability. A causation finding would depend on the additional assumption that any tax increase would be traceable to the STO tax credit. And respondents have not established that an injunction against the credit's application would prompt Arizona legislators to "pass along [any] increased revenue [as] tax reductions." *Ibid.* Pp. 6–10.

(c) Respondents' suit does not fall within the narrow exception to the rule against taxpayer standing established in *Flast* v. *Cohen, supra.* There, federal taxpayers had standing to mount an Establishment Clause challenge to a federal statute providing General Treasury funds to support, *inter alia*, textbook purchases for religious schools. To have standing under *Flast,* taxpayers must show (1) a "logical link" between the plaintiff's taxpayer status "and the type of legislative enactment attacked," and (2) "a nexus" between such taxpayer status and "the precise nature of the constitutional infringement alleged." 392 U. S., at 102. Considering the two requirements together, *Flast* explained that individuals suffer a particular injury when, in violation of the Establishment Clause and by means of "the taxing and spending power," their property is transferred through the Government's Treasury to a sectarian entity. *Id.,* at 105–106.

"The taxpayer's allegation in such cases would be that his tax money is being extracted and spent in violation of specific constitutional protections against such abuses of legislative power." *Id.*, at 106. The STO tax credit does not visit the injury identified in *Flast*. When the Government spends funds from the General Treasury, dissenting taxpayers know that they have been made to contribute to an establishment in violation of conscience. In contrast, a tax credit allows dissenting taxpayers to use their own funds in accordance with their own consciences. Here, the STO tax credit does not "extrac[t] and spen[d]" a conscientious dissenter's funds in service of an establishment, 392 U. S., at 106, or " 'force a citizen to contribute' " to a sectarian organization, *id.*, at 103. Rather, taxpayers are free to pay their own tax bills without contributing to an STO, to contribute to a religious or secular STO of their choice, or to contribute to other charitable organizations. Because the STO tax credit is not tantamount to a religious tax, respondents have not alleged an injury for standing purposes. Furthermore, respondents cannot satisfy the requirements of causation and redressability. When the government collects and spends taxpayer money, governmental choices are responsible for the transfer of wealth; the resulting subsidy of religious activity is, under *Flast*, traceable to the government's expenditures; and an injunction against those expenditures would address taxpayer-plaintiffs' objections of conscience. Here, by contrast, contributions result from the decisions of private taxpayers regarding their own funds. Private citizens create private STOs; STOs choose beneficiary schools; and taxpayers then contribute to STOs. Any injury the objectors may suffer are not fairly traceable to the government. And, while an injunction most likely would reduce contributions to STOs, that remedy would not affect noncontributing taxpayers or their tax payments. Pp. 10–16.

(d) Respondents' contrary position—that Arizonans benefiting from the tax credit in effect are paying their state income tax to STOs—assumes that all income is government property, even if it has not come into the tax collector's hands. That premise finds no basis in standing jurisprudence. This Court has sometimes reached the merits in Establishment Clause cases involving tax benefits as opposed to governmental expenditures. See *Mueller* v. *Allen*, 463 U. S. 388; *Committee for Public Ed. & Religious Liberty* v. *Nyquist*, 413 U. S. 756; *Hunt* v. *McNair*, 413 U. S. 734; *Walz* v. *Tax Comm'n of City of New York*, 397 U. S. 664. But those cases did not mention standing and so do not stand for the proposition that no jurisdictional defects existed. Moreover, it is far from clear that any nonbinding *sub silentio* standing determinations in those cases depended on *Flast*, as there are other ways of establishing standing in Establishment Clause cases involving tax benefits. Pp. 16–18.

562 F. 3d 1002, reversed.

KENNEDY, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, THOMAS, and ALITO, JJ., joined.  SCALIA, J., filed a concurring opinion, in which THOMAS, J., joined.  KAGAN, J., filed a dissenting opinion, in which GINSBURG, BREYER, and SOTOMAYOR, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

———

Nos. 09–987 and 09–991

———

ARIZONA CHRISTIAN SCHOOL TUITION ORGANIZA-
TION, PETITIONER
09–987           *v.*
KATHLEEN M. WINN ET AL.


GALE GARRIOTT, DIRECTOR, ARIZONA DEPART-
MENT OF REVENUE, PETITIONER
09–991           *v.*
KATHLEEN M. WINN ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[April 4, 2011]

JUSTICE KENNEDY delivered the opinion of the Court.

Arizona provides tax credits for contributions to school tuition organizations, or STOs. STOs use these contributions to provide scholarships to students attending private schools, many of which are religious. Respondents are a group of Arizona taxpayers who challenge the STO tax credit as a violation of Establishment Clause principles under the First and Fourteenth Amendments. After the Arizona Supreme Court rejected a similar Establishment Clause claim on the merits, respondents sought intervention from the Federal Judiciary.

To obtain a determination on the merits in federal court, parties seeking relief must show that they have standing under Article III of the Constitution. Standing in Estab-

lishment Clause cases may be shown in various ways. Some plaintiffs may demonstrate standing based on the direct harm of what is claimed to be an establishment of religion, such as a mandatory prayer in a public school classroom.  See *School Dist. of Abington Township* v. *Schempp*, 374 U. S. 203, 224, n. 9 (1963).  Other plaintiffs may demonstrate standing on the ground that they have incurred a cost or been denied a benefit on account of their religion.  Those costs and benefits can result from alleged discrimination in the tax code, such as when the availability of a tax exemption is conditioned on religious affiliation.  See *Texas Monthly, Inc.* v. *Bullock*, 489 U. S. 1, 8 (1989) (plurality opinion).

For their part, respondents contend that they have standing to challenge Arizona's STO tax credit for one and only one reason: because they are Arizona taxpayers.  But the mere fact that a plaintiff is a taxpayer is not generally deemed sufficient to establish standing in federal court. To overcome that rule, respondents must rely on an exception created in *Flast* v. *Cohen*, 392 U. S. 83 (1968).  For the reasons discussed below, respondents cannot take advantage of *Flast*'s narrow exception to the general rule against taxpayer standing.  As a consequence, respondents lacked standing to commence this action, and their suit must be dismissed for want of jurisdiction.

I

Respondents challenged §43–1089, a provision of the Arizona Tax Code.  See 1997 Ariz. Sess. Laws §43–1087, codified, as amended, Ariz. Rev. Stat. Ann. §43–1089 (West Supp. 2010).  Section 43–1089 allows Arizona taxpayers to obtain dollar-for-dollar tax credits of up to $500 per person and $1,000 per married couple for contributions to STOs.  §43–1089(A).  If the credit exceeds an individual's tax liability, the credit's unused portion can be carried forward up to five years.  §43–1089(D).  Under a

version of §43–1089 in effect during the pendency of this lawsuit, a charitable organization could be deemed an STO only upon certain conditions. See §43–1089 (West 2006). The organization was required to be exempt from federal taxation under §501(c)(3) of the Internal Revenue Code of 1986. §43–1089(G)(3) (West Supp. 2005). It could not limit its scholarships to students attending only one school. *Ibid.* And it had to allocate "at least ninety per cent of its annual revenue for educational scholarships or tuition grants" to children attending qualified schools. *Ibid.* A "qualified school," in turn, was defined in part as a private school in Arizona that did not discriminate on the basis of race, color, handicap, familial status, or national origin. §43–1089(G)(2).

In an earlier lawsuit filed in state court, Arizona taxpayers challenged §43–1089, invoking both the United States Constitution and the Arizona Constitution. The Arizona Supreme Court rejected the taxpayers' claims on the merits. *Kotterman* v. *Killian*, 193 Ariz. 273, 972 P. 2d 606 (1999). This Court denied certiorari. *Rhodes* v. *Killian*, 528 U. S. 810 (1999); *Kotterman* v. *Killian*, 528 U. S. 921 (1999).

The present action was filed in the United States District Court for the District of Arizona. It named the Director of the Arizona Department of Revenue as defendant. The Arizona taxpayers who brought the suit claimed that §43–1089 violates the Establishment Clause of the First Amendment, as incorporated against the States by the Fourteenth Amendment. Respondents alleged that §43–1089 allows STOs "to use State income-tax revenues to pay tuition for students at religious schools," some of which "discriminate on the basis of religion in selecting students." Complaint in No. 00–0287 (D Ariz.), ¶¶29–31, App. to Pet. for Cert. in No. 09–987, pp. 125a–126a. Respondents requested, among other forms of relief, an injunction against the issuance of §43–1089 tax credits for

contributions to religious STOs.  The District Court dis-
missed respondents' suit as jurisdictionally barred by the
Tax Injunction Act, 28 U. S. C. §1341.  The Court of Ap-
peals reversed.  This Court agreed with the Court of
Appeals and affirmed.  *Hibbs* v. *Winn*, 542 U. S. 88 (2004).

On remand, the Arizona Christian School Tuition Or-
ganization and other interested parties intervened.  The
District Court once more dismissed respondents' suit, this
time for failure to state a claim.  Once again, the Court of
Appeals reversed.  It held that respondents had standing
under *Flast* v. *Cohen*, *supra*.  562 F. 3d 1002 (CA9 2009).
Reaching the merits, the Court of Appeals ruled that
respondents had stated a claim that §43–1089 violated the
Establishment Clause of the First Amendment.  The full
Court of Appeals denied en banc review, with eight judges
dissenting.  586 F. 3d 649 (CA9 2009).  This Court granted
certiorari.  560 U. S. __ (2010).

## II

The concept and operation of the separation of powers
in our National Government have their principal founda-
tion in the first three Articles of the Constitution.  Under
Article III, the Federal Judiciary is vested with the
"Power" to resolve not questions and issues but "Cases" or
"Controversies."  This language restricts the federal judi-
cial power "to the traditional role of the Anglo-American
courts."  *Summers* v. *Earth Island Institute*, 555 U. S. 488,
___ (2009) (slip op., at 4).  In the English legal tradition,
the need to redress an injury resulting from a specific
dispute taught the efficacy of judicial resolution and gave
legitimacy to judicial decrees.  The importance of resolving
specific cases was visible, for example, in the incremental
approach of the common law and in equity's consideration
of exceptional circumstances.  The Framers paid heed to
these lessons.  See U. S. Const., Art. III, § 2 ("The judicial
Power shall extend to all Cases, in Law and Equity . . . ").

By rules consistent with the longstanding practices of Anglo-American courts a plaintiff who seeks to invoke the federal judicial power must assert more than just the "generalized interest of all citizens in constitutional governance." *Schlesinger* v. *Reservists Comm. to Stop the War*, 418 U. S. 208, 217 (1974).

Continued adherence to the case-or-controversy requirement of Article III maintains the public's confidence in an unelected but restrained Federal Judiciary. If the judicial power were "extended to every *question* under the constitution," Chief Justice Marshall once explained, federal courts might take possession of "almost every subject proper for legislative discussion and decision." 4 Papers of John Marshall 95 (C. Cullen ed. 1984) (quoted in *DaimlerChrysler Corp.* v. *Cuno*, 547 U. S. 332, 341 (2006)). The legislative and executive departments of the Federal Government, no less than the judicial department, have a duty to defend the Constitution. See U. S. Const., Art. VI, cl. 3. That shared obligation is incompatible with the suggestion that federal courts might wield an "unconditioned authority to determine the constitutionality of legislative or executive acts." *Valley Forge Christian College* v. *Americans United for Separation of Church and State, Inc.*, 454 U. S. 464, 471 (1982). For the federal courts to decide questions of law arising outside of cases and controversies would be inimical to the Constitution's democratic character. And the resulting conflict between the judicial and the political branches would not, "in the long run, be beneficial to either." *United States* v. *Richardson*, 418 U. S. 166, 188–189 (1974) (Powell, J., concurring). Instructed by Chief Justice Marshall's admonition, this Court takes care to observe the "role assigned to the judiciary" within the Constitution's "tripartite allocation of power." *Valley Forge*, *supra*, at 474 (internal quotation marks omitted).

### III

To state a case or controversy under Article III, a plaintiff must establish standing. *Allen* v. *Wright*, 468 U. S. 737, 751 (1984). The minimum constitutional requirements for standing were explained in *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555 (1992).

> "First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not "conjectural" or "hypothetical."'" Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.' Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.*, at 560–561 (citations and footnote omitted).

In requiring a particular injury, the Court meant "that the injury must affect the plaintiff in a personal and individual way." *Id.*, at 560, n. 1. The question now before the Court is whether respondents, the plaintiffs in the trial court, satisfy the requisite elements of standing.

### A

Respondents suggest that their status as Arizona taxpayers provides them with standing to challenge the STO tax credit. Absent special circumstances, however, standing cannot be based on a plaintiff's mere status as a taxpayer. This Court has rejected the general proposition that an individual who has paid taxes has a "continuing, legally cognizable interest in ensuring that those funds are not *used* by the Government in a way that violates the Constitution." *Hein* v. *Freedom From Religion Founda-*

*tion, Inc.*, 551 U. S. 587, 599 (2007) (plurality opinion). This precept has been referred to as the rule against taxpayer standing.

The doctrinal basis for the rule was discussed in *Frothingham* v. *Mellon*, 262 U. S. 447 (1923) (decided with *Massachusetts* v. *Mellon*). There, a taxpayer-plaintiff had alleged that certain federal expenditures were in excess of congressional authority under the Constitution. The plaintiff argued that she had standing to raise her claim because she had an interest in the Government Treasury and because the allegedly unconstitutional expenditure of Government funds would affect her personal tax liability. The Court rejected those arguments. The "effect upon future taxation, of any payment out of funds," was too "remote, fluctuating and uncertain" to give rise to a case or controversy. *Id.*, at 487. And the taxpayer-plaintiff's "interest in the moneys of the Treasury," the Court recognized, was necessarily "shared with millions of others." *Ibid.* As a consequence, *Frothingham* held that the taxpayer-plaintiff had not presented a "judicial controversy" appropriate for resolution in federal court but rather a "matter of public . . . concern" that could be pursued only through the political process. *Id.*, at 487–489.

In a second pertinent case, *Doremus* v. *Board of Ed. of Hawthorne*, 342 U. S. 429 (1952), the Court considered *Frothingham*'s prohibition on taxpayer standing in connection with an alleged Establishment Clause violation. A New Jersey statute had provided that public school teachers would read Bible verses to their students at the start of each schoolday. A plaintiff sought to have the law enjoined, asserting standing based on her status as a taxpayer. Writing for the Court, Justice Jackson reiterated the foundational role that Article III standing plays in our separation of powers.

> "'The party who invokes the power [of the federal
> courts] must be able to show not only that the statute
> is invalid, but that he has sustained or is immediately
> in danger of sustaining some direct injury as a result
> of its enforcement, and not merely that he suffers in
> some indefinite way in common with people gener-
> ally.'" *Doremus*, *supra*, at 434 (quoting *Frothingham*,
> *supra*, at 488).

The plaintiff in *Doremus* lacked any "direct and particular
financial interest" in the suit, and, as a result, a decision
on the merits would have been merely "advisory." 342
U. S., at 434–435. It followed that the plaintiff's allega-
tions did not give rise to a case or controversy subject to
judicial resolution under Article III. *Ibid.* Cf. *School Dist.
of Abington Township* v. *Schempp*, 374 U. S., at 224, n. 9
(finding standing where state laws required Bible readings
or prayer in public schools, not because plaintiffs were
state taxpayers but because their children were enrolled
in public schools and so were "directly affected" by the
challenged laws).

In holdings consistent with *Frothingham* and *Doremus*,
more recent decisions have explained that claims of tax-
payer standing rest on unjustifiable economic and political
speculation. When a government expends resources or
declines to impose a tax, its budget does not necessarily
suffer. On the contrary, the purpose of many governmen-
tal expenditures and tax benefits is "to spur economic
activity, which in turn *increases* government revenues."
*DaimlerChrysler*, 547 U. S., at 344.

Difficulties persist even if one assumes that an expendi-
ture or tax benefit depletes the government's coffers. To
find injury, a court must speculate "that elected officials
will increase a taxpayer-plaintiff's tax bill to make up a
deficit." *Ibid.* And to find redressability, a court must
assume that, were the remedy the taxpayers seek to be

allowed, "legislators will pass along the supposed increased revenue in the form of tax reductions." *Ibid.* It would be "pure speculation" to conclude that an injunction against a government expenditure or tax benefit "would result in any actual tax relief" for a taxpayer-plaintiff. *ASARCO Inc.* v. *Kadish*, 490 U. S. 605, 614 (1989) (opinion of KENNEDY, J.).

These well-established principles apply to the present cases. Respondents may be right that Arizona's STO tax credits have an estimated annual value of over $50 million. See Brief for Respondent Winn et al. 42; see also Arizona Dept. of Revenue, Revenue Impact of Arizona's Tax Expenditures FY 2009/10, p. 48 (preliminary Nov. 15, 2010) (reporting the total estimated "value" of STO tax credits claimed over a 1-year period). The education of its young people is, of course, one of the State's principal missions and responsibilities; and the consequent costs will make up a significant portion of the state budget. That, however, is just the beginning of the analysis.

By helping students obtain scholarships to private schools, both religious and secular, the STO program might relieve the burden placed on Arizona's public schools. The result could be an immediate and permanent cost savings for the State. See Brief for Petitioner Arizona Christian School Tuition Organization 31 (discussing studies indicating that the STO program may on net save the State money); see also *Mueller* v. *Allen*, 463 U. S. 388, 395 (1983) ("By educating a substantial number of students [private] schools relieve public schools of a correspondingly great burden—to the benefit of all taxpayers"). Underscoring the potential financial benefits of the STO program, the average value of an STO scholarship may be far less than the average cost of educating an Arizona public school student. See Brief for Petitioner Garriott 38. Because it encourages scholarships for attendance at private schools, the STO tax credit may not cause the

State to incur any financial loss.

Even assuming the STO tax credit has an adverse effect on Arizona's annual budget, problems would remain.  To conclude there is a particular injury in fact would require speculation that Arizona lawmakers react to revenue shortfalls by increasing respondents' tax liability.  *DaimlerChrysler*, 547 U. S., at 344.  A finding of causation would depend on the additional determination that any tax increase would be traceable to the STO tax credits, as distinct from other governmental expenditures or other tax benefits.  Respondents have not established that an injunction against application of the STO tax credit would prompt Arizona legislators to "pass along the supposed increased revenue in the form of tax reductions."  *Ibid*.  Those matters, too, are conjectural.

Each of the inferential steps to show causation and redressability depends on premises as to which there remains considerable doubt.  The taxpayers have not shown that any interest they have in protecting the State Treasury would be advanced.  Even were they to show some closer link, that interest is still of a general character, not particular to certain persons.  Nor have the taxpayers shown that higher taxes will result from the tuition credit scheme.  The rule against taxpayer standing, a rule designed both to avoid speculation and to insist on particular injury, applies to respondents' lawsuit.  The taxpayers, then, must rely on an exception to the rule, an exception next to be considered.

## B

The primary contention of respondents, of course, is that, despite the general rule that taxpayers lack standing to object to expenditures alleged to be unconstitutional, their suit falls within the exception established by *Flast* v. *Cohen*, 392 U. S. 83.  It must be noted at the outset that, as this Court has explained, *Flast*'s holding provides a

"narrow exception" to "the general rule against taxpayer standing." *Bowen* v. *Kendrick*, 487 U. S. 589, 618 (1988).

At issue in *Flast* was the standing of federal taxpayers to object, on First Amendment grounds, to a congressional statute that allowed expenditures of federal funds from the General Treasury to support, among other programs, "instruction in reading, arithmetic, and other subjects in religious schools, and to purchase textbooks and other instructional materials for use in such schools." 392 U. S., at 85–86. *Flast* held that taxpayers have standing when two conditions are met.

The first condition is that there must be a "logical link" between the plaintiff's taxpayer status "and the type of legislative enactment attacked." *Id*., at 102. This condition was not satisfied in *Doremus* because the statute challenged in that case—providing for the recitation of Bible passages in public schools—involved at most an "incidental expenditure of tax funds." *Flast,* 392 U. S., at 102. In *Flast*, by contrast, the allegation was that the Federal Government violated the Establishment Clause in the exercise of its legislative authority both to collect and spend tax dollars. *Id*., at 103. In the decades since *Flast*, the Court has been careful to enforce this requirement. See *Hein*, 551 U. S. 587 (no standing under *Flast* to challenge federal executive actions funded by general appropriations); *Valley Forge*, 454 U. S. 464 (no standing under *Flast* to challenge an agency's decision to transfer a parcel of federal property pursuant to the Property Clause).

The second condition for standing under *Flast* is that there must be "a nexus" between the plaintiff's taxpayer status and "the precise nature of the constitutional infringement alleged." 392 U. S., at 102. This condition was deemed satisfied in *Flast* based on the allegation that Government funds had been spent on an outlay for religion in contravention of the Establishment Clause. *Id*., at 85–86. In *Frothingham*, by contrast, the claim was that

Congress had exceeded its constitutional authority without regard to any specific prohibition. 392 U. S., at 104–105. Confirming that *Flast* turned on the unique features of Establishment Clause violations, this Court has "declined to lower the taxpayer standing bar in suits alleging violations of any constitutional provision apart from the Establishment Clause." *Hein*, *supra*, at 609 (plurality opinion); see also *Richardson*, 418 U. S. 166 (Statement and Account Clause); *Schlesinger,* 418 U. S. 208 (Incompatibility Clause).

After stating the two conditions for taxpayer standing, *Flast* considered them together, explaining that individuals suffer a particular injury for standing purposes when, in violation of the Establishment Clause and by means of "the taxing and spending power," their property is transferred through the Government's Treasury to a sectarian entity. 392 U. S., at 105–106. As *Flast* put it: "The taxpayer's allegation in such cases would be that his tax money is being extracted and spent in violation of specific constitutional protections against such abuses of legislative power." *Id.*, at 106. *Flast* thus "understood the 'injury' alleged in Establishment Clause challenges to federal spending to be the very 'extract[ion] and spen[ding]' of 'tax money' in aid of religion alleged by a plaintiff." *Daimler-Chrysler*, 547 U. S., at 348 (quoting *Flast*, 392 U. S., at 106)). "Such an injury," *Flast* continued, is unlike "generalized grievances about the conduct of government" and so is "appropriate for judicial redress." *Id.*, at 106.

*Flast* found support for its finding of personal injury in "the history of the Establishment Clause," particularly James Madison's Memorial and Remonstrance Against Religious Assessments. *DaimlerChrysler*, *supra*, at 348. In 1785, the General Assembly of the Commonwealth of Virginia considered a "tax levy to support teachers of the Christian religion." *Flast*, *supra*, at 104, n. 24; see A Bill Establishing A Provision for Teachers of the Christian

Religion, reprinted in *Everson* v. *Board of Ed. of Ewing*, 330 U. S. 1, 74 (1947) (supplemental appendix to dissent of Rutledge, J.). Under the proposed assessment bill, taxpayers would direct their payments to Christian societies of their choosing. *Ibid.* If a taxpayer made no such choice, the General Assembly was to divert his funds to "seminaries of learning," at least some of which "undoubtedly would have been religious in character." *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 869, n. 1 (1995) (Souter, J., dissenting) (internal quotation marks omitted); see also *id.*, at 853, n. 1 (THOMAS, J., concurring). However the "seminaries" provision might have functioned in practice, critics took the position that the proposed bill threatened compulsory religious contributions. See, *e.g.*, T. Buckley, Church and State in Revolutionary Virginia, 1776–1787, pp. 133–134 (1977); H. Eckenrode, Separation of Church and State in Virginia 106–108 (1910).

In the Memorial and Remonstrance, Madison objected to the proposed assessment on the ground that it would coerce a form of religious devotion in violation of conscience. In Madison's view, government should not "'force a citizen to contribute three pence only of his property for the support of any one establishment.'" *Flast*, *supra*, at 103 (quoting 2 Writings of James Madison 183, 186 (G. Hunt ed. 1901)). This Madisonian prohibition does not depend on the amount of property conscripted for sectarian ends. Any such taking, even one amounting to "three pence only," violates conscience. 392 U. S., at 103; cf. *supra*, at 6–7. The proposed bill ultimately died in committee; and the General Assembly instead enacted legislation forbidding "compelled" support of religion. See A Bill for Establishing Religious Freedom, reprinted in 2 Papers of Thomas Jefferson 545–546 (J. Boyd ed. 1950); see also *Flast*, 392 U. S., at 104, n. 24. Madison himself went on to become, as *Flast* put it, "the leading architect of the religion clauses of the First Amendment." *Id.*, at 103. *Flast*

was thus informed by "the specific evils" identified in the public arguments of "those who drafted the Establishment Clause and fought for its adoption." *Id.,* at 103–104; see also Feldman, Intellectual Origins of the Establishment Clause, 77 N. Y. U. L. Rev. 346, 351 (2002) ("[T]he Framers' generation worried that conscience would be violated if citizens were required to pay taxes to support religious institutions with whose beliefs they disagreed"); McConnell, Coercion: The Lost Element of Establishment, 27 Wm. & Mary L. Rev. 933, 936–939 (1986).

Respondents contend that these principles demonstrate their standing to challenge the STO tax credit. In their view the tax credit is, for *Flast* purposes, best understood as a governmental expenditure. That is incorrect.

It is easy to see that tax credits and governmental expenditures can have similar economic consequences, at least for beneficiaries whose tax liability is sufficiently large to take full advantage of the credit. Yet tax credits and governmental expenditures do not both implicate individual taxpayers in sectarian activities. A dissenter whose tax dollars are "extracted and spent" knows that he has in some small measure been made to contribute to an establishment in violation of conscience. *Flast*, *supra,* at 106. In that instance the taxpayer's direct and particular connection with the establishment does not depend on economic speculation or political conjecture. The connection would exist even if the conscientious dissenter's tax liability were unaffected or reduced. See *DaimlerChrysler*, *supra*, at 348–349. When the government declines to impose a tax, by contrast, there is no such connection between dissenting taxpayer and alleged establishment. Any financial injury remains speculative. See *supra*, at 6–10. And awarding some citizens a tax credit allows other citizens to retain control over their own funds in accordance with their own consciences.

The distinction between governmental expenditures and

tax credits refutes respondents' assertion of standing. When Arizona taxpayers choose to contribute to STOs, they spend their own money, not money the State has collected from respondents or from other taxpayers. Arizona's §43–1089 does not "extrac[t] and spen[d]" a conscientious dissenter's funds in service of an establishment, *Flast*, 392 U. S., at 106, or "'force a citizen to contribute three pence only of his property'" to a sectarian organization, *id.*, at 103 (quoting 2 Writings of James Madison, *supra*, at 186). On the contrary, respondents and other Arizona taxpayers remain free to pay their own tax bills, without contributing to an STO. Respondents are likewise able to contribute to an STO of their choice, either religious or secular. And respondents also have the option of contributing to other charitable organizations, in which case respondents may become eligible for a tax deduction or a different tax credit. See, *e.g.*, Ariz. Rev. Stat. Ann. §43–1088 (West Supp. 2010). The STO tax credit is not tantamount to a religious tax or to a tithe and does not visit the injury identified in *Flast*. It follows that respondents have neither alleged an injury for standing purposes under general rules nor met the *Flast* exception. Finding standing under these circumstances would be more than the extension of *Flast* "to the limits of its logic." *Hein*, 551 U. S., at 615 (plurality opinion). It would be a departure from *Flast*'s stated rationale.

Furthermore, respondents cannot satisfy the requirements of causation and redressability. When the government collects and spends taxpayer money, governmental choices are responsible for the transfer of wealth. In that case a resulting subsidy of religious activity is, for purposes of *Flast*, traceable to the government's expenditures. And an injunction against those expenditures would address the objections of conscience raised by taxpayer-plaintiffs. See *DaimlerChrysler*, 547 U. S., at 344. Here, by contrast, contributions result from the decisions of

private taxpayers regarding their own funds. Private
citizens create private STOs; STOs choose beneficiary
schools; and taxpayers then contribute to STOs. While the
State, at the outset, affords the opportunity to create and
contribute to an STO, the tax credit system is imple-
mented by private action and with no state intervention.
Objecting taxpayers know that their fellow citizens, not
the State, decide to contribute and in fact make the con-
tribution. These considerations prevent any injury the
objectors may suffer from being fairly traceable to the
government. And while an injunction against application
of the tax credit most likely would reduce contributions to
STOs, that remedy would not affect noncontributing tax-
payers or their tax payments. As a result, any injury
suffered by respondents would not be remedied by an
injunction limiting the tax credit's operation.

Resisting this conclusion, respondents suggest that
Arizonans who benefit from §43–1089 tax credits in effect
are paying their state income tax to STOs. In respon-
dents' view, tax credits give rise to standing even if tax
deductions do not, since only the former yield a dollar-for-
dollar reduction in final tax liability. See Brief for Re-
spondent Winn et al. 5–6; Tr. of Oral Arg. 35–36. But
what matters under *Flast* is whether sectarian STOs
receive government funds drawn from general tax reve-
nues, so that moneys have been extracted from a citizen
and handed to a religious institution in violation of the
citizen's conscience. Under that inquiry, respondents'
argument fails. Like contributions that lead to charitable
tax deductions, contributions yielding STO tax credits are
not owed to the State and, in fact, pass directly from tax-
payers to private organizations. Respondents' contrary
position assumes that income should be treated as if it
were government property even if it has not come into the
tax collector's hands. That premise finds no basis in
standing jurisprudence. Private bank accounts cannot be

equated with the Arizona State Treasury.

The conclusion that the *Flast* exception is inapplicable at first may seem in tension with several earlier cases, all addressing Establishment Clause issues and all decided after *Flast*. See *Mueller*, 463 U. S. 388; *Committee for Public Ed. & Religious Liberty* v. *Nyquist*, 413 U. S. 756 (1973); *Hunt* v. *McNair*, 413 U. S. 734 (1973); *Walz* v. *Tax Comm'n of City of New York*, 397 U. S. 664 (1970); cf. *Hibbs* v. *Winn*, 542 U. S. 88 (reaching only threshold jurisdictional issues). But those cases do not mention standing and so are not contrary to the conclusion reached here. When a potential jurisdictional defect is neither noted nor discussed in a federal decision, the decision does not stand for the proposition that no defect existed. See, *e.g.*, *Hagans* v. *Lavine*, 415 U. S. 528, 535, n. 5 (1974) ("[W]hen questions of jurisdiction have been passed on in prior decisions *sub silentio*, this Court has never considered itself bound when a subsequent case finally brings the jurisdictional issue before us"); *United States* v. *L. A. Tucker Truck Lines, Inc.*, 344 U. S. 33, 38 (1952) ("Even as to our own judicial power of jurisdiction, this Court has followed the lead of Mr. Chief Justice Marshall who held that this Court is not bound by a prior exercise of jurisdiction in a case where it was not questioned and it was passed *sub silentio*"); *Frothingham*, *supra*, at 486. The Court would risk error if it relied on assumptions that have gone unstated and unexamined.

Furthermore, if a law or practice, including a tax credit, disadvantages a particular religious group or a particular nonreligious group, the disadvantaged party would not have to rely on *Flast* to obtain redress for a resulting injury. See *Texas Monthly, Inc.* v. *Bullock*, 489 U. S., at 8 (plurality opinion) (finding standing where a general interest magazine sought to recover tax payments on the ground that religious periodicals were exempt from the tax). Because standing in Establishment Clause cases can be shown in various ways, it is far from clear that any

nonbinding *sub silentio* holdings in the cases respondents
cite would have depended on *Flast.*  See, *e.g.*, *Walz, supra,*
at 666–667 (explaining that the plaintiff was an "owner of
real estate" in New York City who objected to the city's
issuance of "property tax exemptions to religious organiza-
tions").  That the plaintiffs in those cases could have
advanced arguments for jurisdiction independent of *Flast*
makes it particularly inappropriate to determine whether
or why standing should have been found where the issue
was left unexplored.

If an establishment of religion is alleged to cause real
injury to particular individuals, the federal courts may
adjudicate the matter.  Like other constitutional provi-
sions, the Establishment Clause acquires substance and
meaning when explained, elaborated, and enforced in the
context of actual disputes.  That reality underlies the case-
or-controversy requirement, a requirement that has not
been satisfied here.

\*　　\*　　\*

Few exercises of the judicial power are more likely to
undermine public confidence in the neutrality and integ-
rity of the Judiciary than one which casts the Court in the
role of a Council of Revision, conferring on itself the power
to invalidate laws at the behest of anyone who disagrees
with them.  In an era of frequent litigation, class actions,
sweeping injunctions with prospective effect, and continu-
ing jurisdiction to enforce judicial remedies, courts must
be more careful to insist on the formal rules of standing,
not less so.  Making the Article III standing inquiry all the
more necessary are the significant implications of consti-
tutional litigation, which can result in rules of wide appli-
cability that are beyond Congress' power to change.

The present suit serves as an illustration of these prin-
ciples.  The fact that respondents are state taxpayers does
not give them standing to challenge the subsidies that

§43–1089 allegedly provides to religious STOs. To alter the rules of standing or weaken their requisite elements would be inconsistent with the case-or-controversy limitation on federal jurisdiction imposed by Article III.

The judgment of the Court of Appeals is reversed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

---

Nos. 09–987 and 09–991

---

ARIZONA CHRISTIAN SCHOOL TUITION ORGANIZA-
TION, PETITIONER
09–987                    *v.*
KATHLEEN M. WINN ET AL.


GALE GARRIOTT, DIRECTOR, ARIZONA DEPART-
MENT OF REVENUE, PETITIONER
09–991                    *v.*
KATHLEEN M. WINN ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[April 4, 2011]

JUSTICE SCALIA, with whom JUSTICE THOMAS joins,
concurring.

Taxpayers ordinarily do not have standing to challenge
federal or state expenditures that allegedly violate the
Constitution. See *DaimlerChrysler Corp.* v. *Cuno*, 547
U. S. 332, 343–345 (2006). In *Flast* v. *Cohen*, 392 U. S. 83
(1968), we created a narrow exception for taxpayers rais-
ing Establishment Clause challenges to government ex-
penditures. Today's majority and dissent struggle with
whether respondents' challenge to the Arizona tuition tax
credit falls within that narrow exception. Under a princi-
pled reading of Article III, their struggles are unnecessary.
*Flast* is an anomaly in our jurisprudence, irreconcilable
with the Article III restrictions on federal judicial power
that our opinions have established. I would repudiate that
misguided decision and enforce the Constitution. See
*Hein* v. *Freedom From Religion Foundation, Inc.*, 551 U. S.

587, 618 (2007) (SCALIA, J., concurring in judgment).

I nevertheless join the Court's opinion because it finds respondents lack standing by applying *Flast* rather than distinguishing it away on unprincipled grounds. Cf. *Hein*, *supra*, at 628–631.

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 09–987 and 09–991

_____

ARIZONA CHRISTIAN SCHOOL TUITION ORGANIZA-
TION, PETITIONER
09–987            *v.*
KATHLEEN M. WINN ET AL.


GALE GARRIOTT, DIRECTOR, ARIZONA DEPART-
MENT OF REVENUE, PETITIONER
09–991            *v.*
KATHLEEN M. WINN ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[April 4, 2011]

JUSTICE KAGAN, with whom JUSTICE GINSBURG, JUSTICE BREYER, and JUSTICE SOTOMAYOR join, dissenting.

Since its inception, the Arizona private-school-tuition tax credit has cost the State, by its own estimate, nearly $350 million in diverted tax revenue. The Arizona taxpayers who instituted this suit (collectively, Plaintiffs) allege that the use of these funds to subsidize school tuition organizations (STOs) breaches the Establishment Clause's promise of religious neutrality. Many of these STOs, the Plaintiffs claim, discriminate on the basis of a child's religion when awarding scholarships.

For almost half a century, litigants like the Plaintiffs have obtained judicial review of claims that the government has used its taxing and spending power in violation of the Establishment Clause. Beginning in *Flast* v. *Cohen*, 392 U. S. 83 (1968), and continuing in case after case for

over four decades, this Court and others have exercised
jurisdiction to decide taxpayer-initiated challenges not
materially different from this one.  Not every suit has
succeeded on the merits, or should have.  But every tax-
payer-plaintiff has had her day in court to contest the
government's financing of religious activity.

Today, the Court breaks from this precedent by refusing
to hear taxpayers' claims that the government has uncon-
stitutionally subsidized religion through its tax system.
These litigants lack standing, the majority holds, because
the funding of religion they challenge comes from a tax
credit, rather than an appropriation.  A tax credit, the
Court asserts, does not injure objecting taxpayers, because
it "does not extract and spend [their] funds in service of an
establishment."  *Ante*, at 15 (internal quotation marks and
alterations omitted).

This novel distinction in standing law between appro-
priations and tax expenditures has as little basis in prin-
ciple as it has in our precedent.  Cash grants and targeted
tax breaks are means of accomplishing the same govern-
ment objective—to provide financial support to select
individuals or organizations.  Taxpayers who oppose state
aid of religion have equal reason to protest whether that
aid flows from the one form of subsidy or the other.  Either
way, the government has financed the religious activity.
And so either way, taxpayers should be able to challenge
the subsidy.

Still worse, the Court's arbitrary distinction threatens to
eliminate *all* occasions for a taxpayer to contest the gov-
ernment's monetary support of religion.  Precisely because
appropriations and tax breaks can achieve identical objec-
tives, the government can easily substitute one for the
other.  Today's opinion thus enables the government to
end-run *Flast*'s guarantee of access to the Judiciary.  From
now on, the government need follow just one simple rule—
subsidize through the tax system—to preclude taxpayer

challenges to state funding of religion.

And that result—the effective demise of taxpayer standing—will diminish the Establishment Clause's force and meaning. Sometimes, no one other than taxpayers has suffered the injury necessary to challenge government sponsorship of religion. Today's holding therefore will prevent federal courts from determining whether some subsidies to sectarian organizations comport with our Constitution's guarantee of religious neutrality. Because I believe these challenges warrant consideration on the merits, I respectfully dissent from the Court's decision.

I

As the majority recounts, this Court has held that paying taxes usually does not give an individual Article III standing to challenge government action. *Ante*, at 6–10. Taxpayers cannot demonstrate the requisite injury because each person's "interest in the moneys of the Treasury . . . is comparatively minute and indeterminable." *Frothingham* v. *Mellon*, 262 U. S. 447, 487 (1923) (decided with *Massachusetts* v. *Mellon*). Given the size and complexity of government budgets, it is a "fiction" to contend that an unlawful expenditure causes an individual "any measurable economic harm." *Hein* v. *Freedom From Religion Foundation, Inc.*, 551 U. S. 587, 593 (2007) (plurality opinion). Nor can taxpayers in the ordinary case establish causation (*i.e.,* that the disputed government measure affects their tax burden) or redressability (*i.e.,* that a judicial remedy would result in tax reductions). *Ante*, at 8–9. On these points, all agree.

The disagreement concerns their relevance here. This case is not about the general prohibition on taxpayer standing, and cannot be resolved on that basis. This case is instead about the exception to the rule—the principle established decades ago in *Flast* that taxpayers *may* challenge certain government actions alleged to violate the

Establishment Clause.   The Plaintiffs have standing if
their suit meets *Flast*'s requirements—and it does so
under any fair reading of that decision.

Taxpayers have standing, *Flast* held, when they allege
that a statute enacted pursuant to the legislature's taxing
and spending power violates the Establishment Clause.
392 U. S., at 105–106.   In this situation, the Court ex-
plained, a plaintiff can establish a two-part nexus "be-
tween the [taxpayer] status asserted and the claim sought
to be adjudicated."   *Id.,* at 102.   First, by challenging
legislative action taken under the taxing and spending
clause, the taxpayer shows "a logical link between [her]
status and the type of . . . enactment attacked."   *Ibid.*
Second, by invoking the Establishment Clause—a specific
limitation on the legislature's taxing and spending
power—the taxpayer demonstrates "a nexus between [her]
status and the precise nature of the constitutional in-
fringement alleged."   *Ibid.*   Because of these connections,
*Flast* held, taxpayers alleging that the government is
using tax proceeds to aid religion have "the necessary
stake . . . in the outcome of the litigation to satisfy Article
III."   *Ibid.*   They are "proper and appropriate part[ies]"—
indeed, often the only possible parties—to seek judicial
enforcement of the Constitution's guarantee of religious
neutrality. *Ibid.*

That simple restatement of the *Flast* standard should be
enough to establish that the Plaintiffs have standing.
They attack a provision of the Arizona tax code that the
legislature enacted pursuant to the State Constitution's
taxing and spending clause (*Flast* nexus, part 1).   And
they allege that this provision violates the Establishment
Clause (*Flast* nexus, part 2).   By satisfying both of *Flast*'s
conditions, the Plaintiffs have demonstrated their "stake
as taxpayers" in enforcing constitutional restraints on the
provision of aid to STOs.   *Ibid.*   Indeed, the connection in
this case between "the [taxpayer] status asserted and the

claim sought to be adjudicated," *ibid.,* could not be any tighter: As noted when this Court previously addressed a different issue in this lawsuit, the Plaintiffs invoke the Establishment Clause to challenge "an integral part of the State's *tax* statute" that "is reflected on state *tax* forms" and that "is part of the calculus necessary to determine *tax* liability." *Hibbs* v. *Winn*, 542 U. S. 88, 119 (2004) *(Winn I)* (KENNEDY, J., dissenting) (emphasis added). Finding standing here is merely a matter of applying *Flast*. I would therefore affirm the Court of Appeals' determination (not questioned even by the eight judges who called for rehearing en banc on the merits) that the Plaintiffs can pursue their claim in federal court.

## II

The majority reaches a contrary decision by distinguishing between two methods of financing religion: A taxpayer has standing to challenge state subsidies to religion, the Court announces, when the mechanism used is an appropriation, but not when the mechanism is a targeted tax break, otherwise called a "tax expenditure."[1] In the former case, but not in the latter, the Court declares, the taxpayer suffers cognizable injury. *Ante*, at 14–15.

_____

[1] "Tax expenditures" are monetary subsidies the government bestows on particular individuals or organizations by granting them preferential tax treatment. The co-chairmen of the National Commission on Fiscal Responsibility and Reform recently referred to these tax breaks as "the various deductions, credits and loopholes that are just spending by another name." Washington Post, Feb. 20, 2011, p. A19, col. 3; see also 2 U. S. C. §622(3) (defining "tax expenditures," for purposes of the Federal Government's budgetary process, as "those revenue losses attributable to provisions of the . . . tax laws which allow a special exclusion, exemption, or deduction from gross income or which provide a special credit, a preferential rate of tax, or a deferral of tax liability"); S. Surrey & P. McDaniel, Tax Expenditures 3 (1985) (explaining that tax expenditures "represent government spending for favored activities or groups, effected through the tax system rather than through direct grants, loans, or other forms of government assistance").

But this distinction finds no support in case law, and just as little in reason. In the decades since *Flast*, no court—not one—has differentiated between appropriations and tax expenditures in deciding whether litigants have standing. Over and over again, courts (including this one) have faced Establishment Clause challenges to tax credits, deductions, and exemptions; over and over again, these courts have reached the merits of these claims. And that is for a simple reason: Taxpayers experience the same injury for standing purposes whether government subsidization of religion takes the form of a cash grant or a tax measure. The only rationale the majority offers for its newfound distinction—that grants, but not tax expenditures, somehow come from a complaining taxpayer's own wallet—cannot bear the weight the Court places on it. If *Flast* is still good law—and the majority today says nothing to the contrary—then the Plaintiffs should be able to pursue their claim on the merits.

### A

Until today, this Court has never so much as hinted that litigants in the same shoes as the Plaintiffs lack standing under *Flast*. To the contrary: We have faced the identical situation five times—including in a prior incarnation of this very case!—and we have five times resolved the suit without questioning the plaintiffs' standing. Lower federal courts have followed our example and handled the matter in the same way. I count 14 separate cases (involving 20 appellate and district courts) that adjudicated taxpayer challenges to tax expenditures alleged to violate the Establishment Clause.[2] I suspect I have missed a few.

---

[2] See *Johnson* v. *Economic Development Corporation of Cty. of Oakland*, 241 F. 3d 501 (CA6 2001), aff'g 64 F. Supp. 2d 657 (ED Mich. 1999); *Steele* v. *Industrial Development Bd. of Metropolitan Govt. Nashville*, 301 F. 3d 401 (CA6 2002), rev'g 117 F. Supp. 2d 693 (MD Tenn. 2000); *Christie* v. *United States*, 31 Fed. Appx. 571 (CA9 2002),

I have not found any instance of a court dismissing such a claim for lack of standing.

Consider the five cases in which this Court entertained suits filed by taxpayers alleging that tax expenditures unlawfully subsidized religion. We first took up such a challenge in *Walz* v. *Tax Comm'n of City of New York*, 397 U. S. 664, 666–667 (1970), where we upheld the constitutionality of a property tax exemption for religious organizations. Next, in *Hunt* v. *McNair*, 413 U. S. 734, 735–736, 738–739 (1973), we decided that the Establishment Clause permitted a state agency to issue tax-exempt bonds to sectarian institutions. The same day, in *Committee for Public Ed. & Religious Liberty* v. *Nyquist*, 413 U. S. 756, 789–794 (1973), we struck down a state tax deduction for parents who paid tuition at religious and other private schools. A decade later, in *Mueller* v. *Allen*, 463 U. S. 388, 390–391 (1983), we considered, but this time rejected, a similar Establishment Clause challenge to a state tax deduction for expenses incurred in attending such schools. And most recently, we decided a preliminary issue *in this*

_____

aff'g No. 00–cv–02392–J (SD Cal., Apr. 23, 2001); *Mueller* v. *Allen*, 676 F. 2d 1195 (CA8 1982), aff'g 514 F. Supp. 998 (Minn. 1981); *Rhode Island Federation of Teachers, AFL–CIO* v. *Norberg*, 630 F. 2d 855 (CA1 1980), aff'g 479 F. Supp. 1364 (RI 1979); *Public Funds for Public Schools of N. J.* v. *Byrne*, 590 F. 2d 514 (CA3 1979), aff'g 444 F. Supp. 1228 (NJ 1978); *Freedom from Religion Foundation, Inc.* v. *Geithner*, 715 F. Supp. 2d 1051 (ED Cal. 2010); *Gillam* v. *Harding Univ.*, No. 4:08–CV–00363BSM, 2009 WL 1795303,*1 (ED Ark., June 24, 2009); *Leverett* v. *United States Bur. of HHS,* No. Civ. A. 99–S–1670, 2003 WL 21770810,*1 (D Colo., June 9, 2003); *Luthens* v. *Bair*, 788 F. Supp. 1032 (SD Iowa 1992); *Minnesota Civ. Liberties Union* v. *Roemer*, 452 F. Supp. 1316 (Minn. 1978); *Kosydar* v. *Wolman*, 353 F. Supp. 744 (SD Ohio 1972) *(per curiam)* (three-judge court); *Committee for Public Ed. & Religious Liberty* v. *Nyquist*, 350 F. Supp. 655 (SDNY 1972) (three-judge court); *United Ams. for Public Schools* v. *Franchise Tax Bd. of Cal.*, No. C–73–0090 (ND Cal., Feb. 1, 1974) (three-judge court), reprinted in App. to Juris. Statement in *Franchise Tax Bd. of Cal.* v. *United Ams. for Public Schools*, O. T. 1973, No. 73–1718, pp. 1–4.

*very case*, ruling that the Tax Injunction Act, 28 U. S. C.
§1341, posed no barrier to the Plaintiffs' litigation of their
Establishment Clause claim.   See *Winn I*, 542 U. S., at
112.[3]  The Court in all five of these cases divided sharply
on the merits of the disputes.   But in one respect, the
Justices were unanimous: Not a single one thought to
question the litigants' standing.

The Solicitor General, participating here as *amicus
curiae*, conceded at oral argument that under the Federal
Government's—and now the Court's—view of taxpayer
standing, each of these five cases should have been dis-
missed for lack of jurisdiction.

> "[The Court:]  So if you are right, . . . the Court was
> without authority to decide *Walz*, *Nyquist*, *Hunt*,
> *Mueller*, [and] *Hibbs* [v. *Winn*,] this very case, just a
> few years ago? . . . .
> [Solicitor General:]  Right. . . . [M]y answer to you is
> yes.
> [The Court:]  I just want to make sure I heard your
> answer to the—you said the answer is yes.  In other
> words, you agree . . . those cases were wrongly de-
> cided. . . .   [Y]ou would have said there would have
> been no standing in those cases.

_____

[3] We have also several times summarily affirmed lower court deci-
sions adjudicating taxpayer challenges to tax expenditures alleged to
violate the Establishment Clause.  See *Byrne* v. *Public Funds for Public
Schools of N. J.*, 442 U. S. 907 (1979), summarily aff'g 590 F. 2d 514,
516, n. 3 (CA3) (holding that "plaintiffs, as taxpayers, have standing
under *Flast*" to challenge a tax deduction for dependents attending
religious and other private schools); *Grit* v. *Wolman*, 413 U. S. 901
(1973), summarily aff'g *Kosydar* v. *Wolman*, 353 F. Supp. 744, 749 (SD
Ohio 1972) (three-judge court) (noting that no party had questioned the
standing of taxpayers to contest tax credits for private-school tuition
payments); *Franchise Tax Bd. of Cal.* v. *United Ams. for Public Schools*,
419 U. S. 890 (1974), summarily aff'g No. C–73–0090 (ND Cal., Feb. 1,
1974) (three-judge court) (invalidating a tax credit for children attend-
ing private schools).

[Solicitor General:]   No taxpayer standing."   Tr. of
Oral Arg. 10–12.

Nor could the Solicitor General have answered differently.
Each of these suits, as described above, alleged that a
state tax expenditure violated the Establishment Clause.
And each relied *only* on taxpayer standing as the basis for
federal-court review.[4]   The Court today speculates that
"the plaintiffs in those cases could have advanced argu-
ments for jurisdiction independent of *Flast*."   *Ante*, at 18.
But whatever could have been, in fact not one of them did
so.

   And the Court itself understood the basis of standing in
these five cases.   This and every federal court has an
independent obligation to consider standing, even when
the parties do not call it into question.   See, *e.g., FW/PBS,
Inc.* v. *Dallas*, 493 U. S. 215, 230–231 (1990).   To do any-
thing else would risk an unlawful exercise of judicial
authority.   And in these cases the Court had an additional
prompt: In several of them, *amici*, including the United
States, contested—or at least raised as a question—the
plaintiffs' standing as taxpayers to pursue their claims.[5]
The Court, moreover, was well aware at the time of the
issues presented by taxpayer standing.   We decided three
of the cases within a year of elaborating the general bar on

--------

   [4] See App. in *Hibbs* v. *Winn*, O. T. 2003, No. 02–1809, pp. 7–8 (com-
plaint); Pet. for Cert. in *Mueller* v. *Allen*, O. T. 1982, No. 82–195, p. 7;
App. in *Committee for Public Ed. & Religious Liberty* v. *Nyquist*, O. T.
1972, No. 72–694, p. 9a (complaint); App. in *Hunt* v. *McNair*, O. T.
1972, No. 71–1523, p. 5 (complaint); App. in *Walz* v. *Tax Comm'n of
City of New York*, O. T. 1969, No. 135, pp. 5–7 (complaint).
   [5] See, *e.g.,* Brief for United States as *Amicus Curiae* in *Mueller* v.
*Allen*, *supra*, at 12, n. 15; Brief for United States as *Amicus Curiae* in
*Hibbs* v. *Winn*, *supra*, at 3, n. 1; Brief for Honorable Trent Franks et al.
as *Amici Curiae* in *Hibbs* v. *Winn*, *supra*, at 6, n. 2; Brief for United
States Catholic Conference as *Amicus Curiae* in *Walz* v. *Tax Comm'n of
City of New York*, *supra*, at 23–24.

taxpayer suits, see, *e.g., United States* v. *Richardson*, 418
U. S. 166 (1974); *Schlesinger* v. *Reservists Comm. to Stop
the War*, 418 U. S. 208 (1974), and the fourth just after we
held that bar applicable to a different kind of Establish-
ment Clause claim, see *Valley Forge Christian College* v.
*Americans United for Separation of Church and State,
Inc.*, 454 U. S. 464 (1982). Indeed, the decisions on their
face reflect the Court's recognition of what gave the plain-
tiffs standing; in each, we specifically described the plain-
tiffs as taxpayers who challenged the use of the tax system
to fund religious activities. See *Winn I*, 542 U. S., at 94;
*Mueller*, 463 U. S., at 392; *Nyquist*, 413 U. S., at 759, 762;
*Hunt*, 413 U. S., at 735–736; *Walz*, 397 U. S., at 666–667.
In short, we considered and decided all these cases be-
cause we thought taxpayer standing existed.

The majority shrugs off these decisions because they did
not discuss what was taken as obvious. *Ante*, at 17. But
we have previously stressed that the Court should not
"disregard the implications of an exercise of judicial au-
thority assumed to be proper for over 40 years." *Brown
Shoe Co.* v. *United States*, 370 U. S. 294, 307 (1962); see
*Bowen* v. *Kendrick*, 487 U. S. 589, 619 (1988) (finding
standing partly because the Court, in deciding similar
cases, had "not questioned the standing of taxpayer plain-
tiffs to raise Establishment Clause challenges"); *Bank of
United States* v. *Deveaux*, 5 Cranch 61, 88 (1809) (Mar-
shall, C. J.) (prior decisions exercising but not discussing
jurisdiction "have much weight, as they show that [a
jurisdictional flaw] neither occurred to the bar or the
bench"). And that principle has extra force here, because
we have relied on some of these decisions to support the
Court's jurisdiction in other cases. Pause on that for a
moment: The very decisions the majority today so easily
dismisses are featured in our prior cases as exemplars of
jurisdiction. So in *School Dist. of Grand Rapids* v. *Ball*,
473 U. S. 373 (1985), we relied on *Nyquist* and *Hunt* to

conclude that taxpayers had standing to challenge a program of aid to religious and other private schools. 473 U. S., at 380, n. 5, overruled in part on other grounds by *Agostini* v. *Felton*, 521 U. S. 203 (1997). And in *Winn I* (recall, an earlier iteration of this case), we rejected a different jurisdictional objection in part by relying on *Mueller* and *Nyquist*. We called those cases "adjudications of great moment discerning no [jurisdictional] barrier" and warned that they could not "be written off as reflecting nothing more than unexamined custom or unthinking habit." 542 U. S., at 112, n. 13 (internal quotation marks and citations omitted). Until today, that is—when the majority does write off these adjudications and reaches a result against all precedent.

B

Our taxpayer standing cases have declined to distinguish between appropriations and tax expenditures for a simple reason: Here, as in many contexts, the distinction is one in search of a difference. To begin to see why, consider an example far afield from *Flast* and, indeed, from religion. Imagine that the Federal Government decides it should pay hundreds of billions of dollars to insolvent banks in the midst of a financial crisis. Suppose, too, that many millions of taxpayers oppose this bailout on the ground (whether right or wrong is immaterial) that it uses their hard-earned money to reward irresponsible business behavior. In the face of this hostility, some Members of Congress make the following proposal: Rather than give the money to banks via appropriations, the Government will allow banks to subtract the exact same amount from the tax bill they would otherwise have to pay to the U. S. Treasury. Would this proposal calm the furor? Or would most taxpayers respond by saying that a subsidy is a subsidy (or a bailout is a bailout), whether accomplished by the one means or by the other? Surely the latter; in-

deed, we would think the less of our countrymen if they
failed to see through this cynical proposal.

And what ordinary people would appreciate, this Court's
case law also recognizes—that targeted tax breaks are
often "economically and functionally indistinguishable
from a direct monetary subsidy." *Rosenberger* v. *Rector
and Visitors of Univ. of Va.*, 515 U. S. 819, 859 (1995)
(THOMAS, J., concurring). Tax credits, deductions, and
exemptions provided to an individual or organization have
"much the same effect as a cash grant to the [recipient] of
the amount of tax it would have to pay" absent the tax
break. *Regan* v. *Taxation With Representation of Wash.*,
461 U. S. 540, 544 (1983). "Our opinions," therefore, "have
long recognized . . . the reality that [tax expenditures] are
a form of subsidy that is administered through the tax
system." *Arkansas Writers' Project, Inc.* v. *Ragland*, 481
U. S. 221, 236 (1987) (SCALIA, J., dissenting) (internal
quotation marks omitted). Or again: Tax breaks "can be
viewed as a form of government spending," *Camps New-
found/Owatonna, Inc.* v. *Town of Harrison*, 520 U. S. 564,
589–590, n. 22 (1997), even assuming the diverted tax
funds do not pass through the public treasury. And once
more: Both special tax benefits and cash grants "repre-
sen[t] a charge made upon the state," *Nyquist*, 413 U. S.,
at 790–791 (internal quotation marks omitted); both de-
plete funds in the government's coffers by transferring
money to select recipients.[6]

---

[6]The majority observes that special tax benefits may in fact "*in-
creas[e]* government revenues" by "spur[ring] economic activity." *Ante*,
at 8 (internal quotation marks omitted). That may be so in the long
run (although the only non-speculative effect is to immediately dimin-
ish funds in the public treasury). But as the majority acknowledges,
*ibid.*, this possibility holds just as true for appropriations; that is why
we (optimistically) refer to some government outlays as "investments."
The insight therefore cannot help the majority distinguish between tax
expenditures and appropriations.

For just this reason, government budgeting rules routinely insist on calculation of tax subsidies, in addition to appropriations. The President must provide information on the estimated cost of tax expenditures in the budget he submits to Congress each year. See 31 U. S. C. §1105(a)(16); n. 1, *supra*. Similarly, congressional budget committees must report to all Members on the level of tax expenditures in the federal budget. See 2 U. S. C. §632(e)(2)(E). Many States—including Arizona—likewise compute the impact of targeted tax breaks on the public treasury, in recognition that these measures are just spending under a different name, see n. 1, *supra*. The Arizona Department of Revenue must issue an annual report "detailing the approximate costs in lost revenue for all state tax expenditures." Ariz. Rev. Stat. Ann. §42–1005(A)(4) (West 2006). The most recent report notes the significance of this accounting in the budget process. It explains that "the fiscal impact of implementing" targeted tax breaks, including the STO credit challenged here, is "similar to a direct expenditure of state funds." Arizona Dept. of Revenue, Revenue Impact of Arizona's Tax Expenditures FY 2009/10, p. 1 (preliminary Nov. 15, 2010); see also Surrey, Tax Incentives as a Device for Implementing Government Policy: A Comparison with Direct Government Expenditures, 83 Harv. L. Rev. 705, 717 (1970) ("A dollar is a dollar—both for the person who receives it and the government that pays it, whether the dollar comes with a tax credit label or a direct expenditure label").

And because these financing mechanisms result in the same bottom line, taxpayers challenging them can allege the same harm. Our prior cases have often recognized the cost that targeted tax breaks impose on taxpayers generally. "When the Government grants exemptions or allows deductions" to some, we have observed, "all taxpayers are affected; the very fact of the exemption or deduction . . . means that other taxpayers can be said to be indirect and

vicarious 'donors.' " *Bob Jones Univ.* v. *United States*, 461
U. S. 574, 591 (1983). And again: "Every tax exemption
constitutes a subsidy that affects nonqualifying taxpayers,
forcing them to" bear its cost. *Texas Monthly, Inc.* v.
*Bullock*, 489 U. S. 1, 14 (1989) (plurality opinion). Indeed,
we have specifically compared the harm arising from a tax
subsidy with that arising from a cash grant, and declared
those injuries equivalent because both kinds of support
deplete the public fisc. "In either case," we stated, "the
alleged injury is based on the asserted effect of the alleg-
edly illegal activity on public revenues, to which the tax-
payer contributes." *DaimlerChrysler Corp.* v. *Cuno*, 547
U. S. 332, 344 (2006). This taxpayer injury of course fails
to establish standing in the mine-run case, whatever form
the state aid takes. See, *e.g., id.,* at 343–344; *ante*, at 6–
10; *supra,* at 3. But the key is this: Whenever taxpayers
have standing under *Flast* to challenge an appropriation,
they should also have standing to contest a tax expendi-
ture. Their access to the federal courts should not depend
on which type of financial subsidy the State has offered.

Consider some further examples of the point, but this
time concerning state funding of religion. Suppose a State
desires to reward Jews—by, say, $500 per year—for their
religious devotion. Should the nature of taxpayers' con-
cern vary if the State allows Jews to claim the aid on their
tax returns, in lieu of receiving an annual stipend? Or
assume a State wishes to subsidize the ownership of cruci-
fixes. It could purchase the religious symbols in bulk and
distribute them to all takers. Or it could mail a reim-
bursement check to any individual who buys her own and
submits a receipt for the purchase. Or it could authorize
that person to claim a tax credit equal to the price she
paid. Now, really—do taxpayers have less reason to com-
plain if the State selects the last of these three options?
The Court today says they do, but that is wrong. The
effect of each form of subsidy is the same, on the public

fisc and on those who contribute to it. Regardless of which mechanism the State uses, taxpayers have an identical stake in ensuring that the State's exercise of its taxing and spending power complies with the Constitution.[7]

Here, the mechanism Arizona has selected is a dollar-for-dollar tax credit to aid school tuition organizations. Each year come April 15, the State tells Arizonans: Either pay the full amount of your tax liability to the State, or subtract up to $500 from your tax bill by contributing that sum to an STO. See *Winn I*, 542 U. S., at 95. To claim the credit, an individual makes a notation on her tax return and splits her tax payment into two checks, one made out to the State and the other to the STO. As this Court recognized in *Winn I*, the STO payment is therefore "costless" to the individual, *ibid.;* it comes out of what she otherwise would be legally obligated to pay the State—hence, out of public resources. And STOs capitalize on this aspect of the tax credit for all it is worth—which is quite a lot. To drum up support, STOs highlight that "donations" are made not with an individual's own, but with other people's—*i.e.*, taxpayers'—money. One STO advertises that "[w]ith Arizona's scholarship tax credit, you can send children to our community's [religious] day schools and it won't cost you a dime!" Brief for Respondents 13 (internal quotation marks and emphasis omitted). Another urges potential donors to "imagine giving [to charity] with someone else's money. . . . Stop Imagining,

---

[7] The majority indicates that some persons could challenge these hypothetical government actions based on individualized injury, separate and apart from taxpayer status. See *ante*, at 1–2, 17–18. That is quite right; indeed, some parents or children likely have standing to challenge the Arizona tax credit on such grounds. But this possibility does not detract from the point made here. The purpose of these illustrations is to show that *if* taxpayer status is the thing alleged to confer standing, it should do so irrespective of the form of the government subsidy.

thanks to Arizona tax laws you can!" *Id.,* at 14 (internal
quotation marks and emphasis omitted). And so Arizo-
nans do just that: It is, after all, good fun to spend other
people's money. By the State's reckoning, from 1998 to
2008 the credit cost Arizona almost $350 million in redi-
rected tax revenue.[8]

The Plaintiffs contend that this expenditure violates the
Establishment Clause. If the legislature had appropriated
these monies for STOs, the Plaintiffs would have standing,
beyond any dispute, to argue the merits of their claim in
federal court. But the Plaintiffs have no such recourse,
the Court today holds, because Arizona funds STOs
through a tax credit rather than a cash grant. No less
than in the hypothetical examples offered above, here too
form prevails over substance, and differences that make
no difference determine access to the Judiciary. And the
casualty is a historic and vital method of enforcing the
Constitution's guarantee of religious neutrality.

C

The majority offers just one reason to distinguish ap-
propriations and tax expenditures: A taxpayer experiences
injury, the Court asserts, only when the government
"extracts and spends" her very own tax dollars to aid
religion. *Ante*, at 15 (internal quotation marks and altera-
tions omitted). In other words, a taxpayer suffers legally

_____

[8] See Arizona Dept. of Revenue, Revenue Impact of Arizona's Tax
Expenditures FY 2009/10, p. 48 (preliminary Nov. 15, 2010); FY
2008/09, p. 54 (preliminary Nov. 16, 2009); FY 2007/08, p. 58 (prelimi-
nary Nov. 17, 2008); FY 2006/07, p. 65 (preliminary Nov. 15, 2007/final
Sept. 2010); FY 2005/06, p. 73 (preliminary Nov. 15, 2006/final Dec.
2009); FY 2004/05, p. 72 (preliminary Nov. 15, 2005/final June 2009);
FY 2003/04, p. 74 (preliminary Nov. 14, 2004/final Feb. 2007); FY
2002/03, p. 74 (preliminary Nov. 15, 2003/final Mar. 2007); FY 2001/02,
p. 71 (preliminary Nov. 15, 2002/final Mar. 2004); FY 2000/01, p. 73
(preliminary Nov. 15, 2001/final July 2003); FY 1999/00, p. 72 (prelimi-
nary Nov. 15, 2000/final Aug. 2002).

cognizable harm if but only if her particular tax dollars wind up in a religious organization's coffers. See also Tr. of Oral Arg. 4 (Solicitor General proposing that the "key point" was: "If you placed an electronic tag to track and monitor each cent that the [Plaintiffs] pay in tax," none goes to religious STOs). And no taxpayer can make this showing, the Court concludes, if the government subsidizes religion through tax credits, deductions, or exemptions (rather than through appropriations).[9]

The majority purports to rely on *Flast* to support this new "extraction" requirement. It plucks the three words "extrac[t] and spen[d]" from the midst of the *Flast* opinion, and suggests that they severely constrict the decision's scope. *Ante*, at 15 (quoting 392 U. S., at 106). And it notes that *Flast* partly relied on James Madison's famed argument in the Memorial and Remonstrance Against Religious Assessments: "'[T]he same authority which can force a citizen to contribute three pence only of his property for

_____

[9] Even taken on its own terms, the majority's reasoning does not justify the conclusion that the Plaintiffs lack standing. Arizona's tuition-tax-credit program in fact necessitates the direct expenditure of funds from the state treasury. After all, the statute establishing the initiative requires the Arizona Department of Revenue to certify STOs, maintain an STO registry, make the registry available to the public on request and post it on a website, collect annual reports filed by STOs, and send written notice to STOs that have failed to comply with statutory requirements. Ariz. Rev. Stat. Ann. §§43–1502(A)–(C), 43–1506 (West Supp. 2010). Presumably all these activities cost money, which comes from the state treasury. Thus, on the majority's own theory, the government has "extract[ed] and spen[t]" the Plaintiffs' (along with other taxpayers') dollars to implement the challenged program, and the Plaintiffs should have standing. (The majority, after all, makes clear that nothing in its analysis hinges on the size or proportion of the Plaintiffs' contribution. *Ante*, at 13.) But applying the majority's theory in this way reveals the hollowness at its core. Can anyone believe that the Plaintiffs have suffered injury through the costs involved in administering the program, but not through the far greater costs of granting the tax expenditure in the first place?

the support of any one establishment, may force him to
conform to any other establishment in all cases whatso-
ever.'"  392 U. S., at 103 (quoting 2 Writings of James
Madison 183, 186 (G. Hunt ed. 1901)); see *ante,* at 12–14.
And that is all the majority can come up with.

But as indicated earlier, everything of import in *Flast*
cuts against the majority's position.  Here is how *Flast*
stated its holding: "[W]e hold that a taxpayer will have
standing consistent with Article III to invoke federal
judicial power when he alleges that congressional action
under the taxing and spending clause is in derogation of"
the Establishment Clause.  392 U. S., at 105–106.  Noth-
ing in that straightforward sentence supports the idea
that a taxpayer can challenge only legislative action that
disburses his particular contribution to the state treasury.
And here is how *Flast* primarily justified its holding:
"[O]ne of the specific evils feared by those who drafted the
Establishment Clause and fought for its adoption was that
the taxing and spending power would be used to favor one
religion over another or to support religion in general."
*Id.*, at 103.  That evil arises even if the specific dollars that
the government uses do not come from citizens who object
to the preference.  Likewise, the two-part nexus test,
which is the heart of *Flast*'s doctrinal analysis, contains no
hint of an extraction requirement.  See *supra*, at 4.  And
finally, James Madison provides no comfort to today's
majority.  He referred to "three pence" exactly because it
was, even in 1785, a meaningless sum of money; then, as
today, the core injury of a religious establishment had
naught to do with any given individual's out-of-pocket loss.
See *infra*, at 21–23 (further discussing Madison's views).
So the majority is left with nothing, save for three words
*Flast* used to describe the particular facts in that case: In
not a single non-trivial respect could the *Flast* Court
recognize its handiwork in the majority's depiction.

The injury to taxpayers that *Flast* perceived arose

whenever the legislature used its taxing-and-spending power to channel tax dollars to religious activities. In that and subsequent cases (including the five in this Court involving tax expenditures), a taxpayer pleaded the requisite harm by stating that public resources were funding religion; the tracing of particular dollars (whether by the Solicitor General's "electronic tag" or other means) did not enter into the question. See *DaimlerChrysler Corp.*, 547 U. S., at 348 (describing how the *Flast* Court's understanding of the Establishment Clause's history led the Court to view the alleged "injury" as the expenditure of "'tax money' in aid of religion" (quoting *Flast*, 392 U. S., at 106)). And for all the reasons already given, that standard is met regardless whether the funding is provided via cash grant or tax expenditure. See *supra*, at 11–16. Taxpayers pick up the cost of the subsidy in either form. See *ibid.* So taxpayers have an interest in preventing the use of either mechanism to infringe religious neutrality.[10]

———————

[10] On this traditional view of the harm to taxpayers arising from state financing of religion, the Plaintiffs here can satisfy not only Article III's injury requirement, but also its causation and redressability requirements. The majority's contrary position, *ante*, at 15–16, stems from its miscasting of the injury involved; once that harm is stated correctly, all the rest follows. To wit: The Plaintiffs allege they suffer *injury* when the State funnels public resources to religious organizations through the tax credit. Arizona, they claim, has *caused* this injury by enacting legislation that establishes the credit. And an injunction limiting the credit's operation would *redress* the harm by preventing the allegedly unlawful diversion of tax revenues. The Plaintiffs need not, as the majority insists, show that this remedy would "affect . . . their tax payments," *ante*, at 16, any more than the taxpayer in *Flast* had to establish that her tax burden would decrease absent the Government's funding of religious schools. As we have previously recognized, when taxpayers object to the spending of tax money in violation of the Establishment Clause (whether through tax credits or appropriations), "an injunction against the spending would . . . redress [their] injury, regardless of whether lawmakers would dispose of the savings in a way that would benefit the taxpayer-plaintiffs personally." *DaimlerChrysler Corp.* v. *Cuno*, 547 U. S. 332, 348–349 (2006).

Indeed, the majority's new conception of injury is at odds not merely with *Flast*, but also (if ironically) with our cases precluding taxpayer standing generally.  See *supra*, at 3; *ante*, at 6–10.  Today's majority insists that legislation challenged under the Establishment Clause must "extrac[t] and spen[d] a conscientious dissenter's funds." *Ante*, at 15.  But we have rejected taxpayer standing in other contexts because each taxpayer's share of treasury funds is "minute and indeterminable." *Frothingham*, 262 U. S., at 487.  No taxpayer can point to an expenditure (by cash grant or otherwise) and say that her own tax dollars are in the mix; in fact, they almost surely are not.  "[I]t is," as we have noted, "a complete fiction to argue that an unconstitutional . . . expenditure causes an individual . . . taxpayer any measurable economic harm." *Hein*, 551 U. S., at 593 (plurality opinion).  That is as true in Establishment Clause cases as in any others.  Taxpayers have standing in these cases *despite* their foreseeable failure to show that the alleged constitutional violation involves their own tax dollars, not *because* the State has used their particular funds.

And something still deeper is wrong with the majority's "extract and spend" requirement: It does not measure what matters under the Establishment Clause.  Let us indulge the Court's fiction that a taxpayer's ".000000000001 penny" is somehow involved in an ordinary appropriation of public funds for religious activity (thus supposedly distinguishing it from a tax expenditure).  Still, consider the following example: Imagine the Internal Revenue Service places a checkbox on tax returns asking filers if they object to the government using their taxes to aid religion.  If the government keeps "yes" money separate from "no" money and subsidizes religious activities only from the nonobjectors' account, the majority's analysis suggests that no taxpayer would have standing to allege a violation of the Establishment Clause.  The funds

used, after all, would not have been "extracted from a citizen and handed to a religious institution in violation of the citizen's conscience." *Ante*, at 16. But this Court has never indicated that States may insulate subsidies to religious organizations from legal challenge by eliciting the consent of some taxpayers. And the Court has of course been right not to take this approach. Taxpayers incur the same harm, and should have the same ability to bring suit, whether the government stores tax funds in one bank account or two. None of the principles underlying the Establishment Clause suggests otherwise.

James Madison, whom the Court again rightly labels "the leading architect of the religion clauses," *ante*, at 13 (quoting *Flast*, 392 U. S., at 103; internal quotation marks omitted), had something important to say about the matter of "extraction." As the majority notes, Madison's Memorial and Remonstrance criticized a tax levy proposed in Virginia to aid teachers of the Christian religion. *Ante*, at 12–13. But Madison's passionate opposition to that proposal informs this case in a manner different than the majority suggests. The Virginia tax in fact would not have extracted any monies (not even "three pence") from unwilling citizens, as the Court now requires. The plan allowed conscientious objectors to opt out of subsidizing religion by contributing their assessment to an alternative fund for the construction and maintenance of county schools.[11] See

──────────

[11] The opt-out provision described county schools as "seminaries of learning." A Bill for Establishing A Provision for Teachers of the Christian Religion, reprinted in *Everson* v. *Board of Ed. of Ewing*, 330 U. S. 1, 74 (1947) (supplemental appendix to dissent of Rutledge, J.). In 1785, that phrase had no particular religious connotation: It "meant schools for general education, not schools for the training of ministers." Berg & Laycock, Mistakes in *Locke v. Davey* and the Future of State Payments for Services Provided by Religious Institutions, 40 Tulsa L. Rev. 227, 244, n. 113 (2004); see also, *e.g.,* 2 S. Johnson, Dictionary of the English Language 1741 (1773) ("seminary" means "place of education, from whence scholars are transplanted into life").

A Bill Establishing A Provision for Teachers of the Christian Religion, reprinted in *Everson* v. *Board of Ed. of Ewing*, 330 U. S. 1, 74 (1947) (supplemental appendix to dissent of Rutledge, J.); Letter from James Madison to Thomas Jefferson (Jan. 9, 1785), reprinted in 2 Writings of James Madison, at 102, 113; see also Blasi, School Vouchers and Religious Liberty: Seven Questions from Madison's *Memorial and Remonstrance*, 87 Cornell L. Rev. 783, 784 (2002) (the tax provision "permitted each taxpayer to specify which Christian denomination should receive his payment" and "[t]hose who did not wish to support a church could direct their assessment to a proposed common school fund"). Indeed, the Virginia Assessment was specifically "designed to avoid any charges of coercion of dissenters to pay taxes to support religious teachings with which they disagreed." Feldman, Intellectual Origins of the Establishment Clause, 77 N. Y. U. L. Rev. 346, 383 (2002).[12]

---

[12] The majority speculates that the Virginia General Assembly would have given some of the monies collected from conscientious objectors to schools with a sectarian bent. *Ante*, at 13. Because the Assessment never became law, no one can know which county schools would have received aid; indeed, the first of these schools did not open its doors until decades later. See W. Miller, First Liberty 26 (2003); see generally J. Buck, Development of Public Schools in Virginia 1607–1952 (1952). But historians and legal scholars have uniformly understood the opt-out provision as a considered attempt to accommodate taxpayers who did not want their tax dollars to go to religion. See Berg & Laycock, *supra*, at 244, n. 113 (the "provision for payment to a school fund was not an effort to support religious schools as part of support for education overall," but rather "was an effort to accommodate the possibility of non-Christian taxpayers"); T. Buckley, Church and State in Revolutionary Virginia, 1776–1787, p. 133 (1977) (under the "text of the proposed bill . . . nonbelievers would [not] be forced to contribute to religion" because "[t]he assessment had been carefully drafted to permit those who preferred to support education rather than religion to do so"); see also, *e.g.,* Miller, *supra*, at 26; Underkuffler-Freund, Separation of the Religious and the Secular: A Foundational Challenge to First Amendment Theory, 36 Wm. & Mary L. Rev. 837, 889–890, n. 265

In this respect, the Virginia Assessment is just like the Arizona tax credit. Although both funnel tax funds to religious organizations (and so saddle *all* taxpayers with the cost), neither forces any given taxpayer to pay for the subsidy out of her pocket. Madison thought that feature of the Assessment insufficient to save it. By relying on the selfsame aspect of the Arizona scheme to deny the Plaintiffs' claim of injury, the majority betrays Madison's vision.

## III

Today's decision devastates taxpayer standing in Establishment Clause cases. The government, after all, often uses tax expenditures to subsidize favored persons and activities. Still more, the government almost *always* has this option. Appropriations and tax subsidies are readily interchangeable; what is a cash grant today can be a tax break tomorrow. The Court's opinion thus offers a road-map—more truly, just a one-step instruction—to any government that wishes to insulate its financing of religious activity from legal challenge. Structure the funding as a tax expenditure, and *Flast* will not stand in the way. No taxpayer will have standing to object. However blatantly the government may violate the Establishment Clause, taxpayers cannot gain access to the federal courts.

And by ravaging *Flast* in this way, today's decision damages one of this Nation's defining constitutional commitments. "Congress shall make no law respecting an establishment of religion"—ten simple words that have stood for over 200 years as a foundation stone of American religious liberty. Ten words that this Court has long understood, as James Madison did, to limit (though by no

––––––––––

(1995); Adams & Emmerich, Heritage of Religious Liberty, 137 U. Pa. L. Rev. 1559, 1573 (1989); Laycock, "Nonpreferential" Aid to Religion: A False Claim About Original Intent, 27 Wm. & Mary L. Rev. 875, 897, and n. 108 (1985–1986); L. Pfeffer, Church State and Freedom 110 (rev. ed. 1967).

means eliminate) the government's power to finance reli-
gious activity.  The Court's ruling today will not shield all
state subsidies for religion from review; as the Court
notes, some persons alleging Establishment Clause viola-
tions have suffered individualized injuries, and therefore
have standing, independent of their taxpayer status.  See
*ante*, at 1–2, 17–18.  But *Flast* arose because "the taxing
and spending power [may] be used to favor one religion
over another or to support religion in general," 392 U. S.,
at 103, without causing particularized harm to discrete
persons.  It arose because state sponsorship of religion
sometimes harms individuals only (but this "only" is no
small matter) in their capacity as contributing members of
our national community.  In those cases, the *Flast* Court
thought, our Constitution's guarantee of religious neutral-
ity still should be enforced.

Because that judgment was right then, and remains
right today, I respectfully dissent.